Sam **HOOVER**, Petitioner-Appellant,

v.

Dr. George J. **BETO**, Director, Texas Department of Corrections, Respondent-Appellee.

No. 29587.

United States Court of Appeals, Fifth Circuit.

Aug. 9. 1972.

Certiorari Denied Dec. 18, 1972.

See 93 S.Ct. 703.

Warren Burnet, Odessa, Tex., Raeburn Norris, Houston, Tex., Luther E. Jones, Jr., Corpus Christi, Tex., for petitioner-appellant.

Lonny Zwiener, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RIVES, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.*

AINSWORTH, Circuit Judge.

Seldom has this Court considered a more spectacular or bizarre case than this habeas corpus petition of an experienced Texas criminal lawyer, former mayor of the City of Pasadena, Texas, who was found guilty in Texas State Court of being the mastermind and accomplice in an especially brutal and horrible assault and robbery, but who contends that he was invalidly convicted in violation of federal constitutional rights.

Sam Hoover is presently serving a sixty-year sentence imposed by the Criminal District Court of Harris County, Texas. A jury found him guilty in a separate trial as an accomplice to the crime of robbery by firearms,[1] commit-

---

* Chief Judge Brown did not participate in the consideration of this case.

1. Hoover's conviction was affirmed on appeal to the Texas Court of Criminal Appeals. See Hoover v. State, Tex.Cr.App. 1965, 390 S.W.2d 758, rehearing denied. He thereafter filed a petition for writ of habeas corpus in United States District Court which was dismissed for failure to exhaust State remedies. Cf. State of Texas v. Payton, 5 Cir., 1968, 390 F.2d 261; Sellars v. Beto, 5 Cir., 1970, 430 F.2d 1150, 1151. Hoover proceeded to exhaust State remedies by filing a State habeas petition pursuant to Article 11.07, Vernon's Ann.Tex.Code of Crim.Pro., which petition was denied by the State-convicting court and the Texas Court of Criminal Appeals on appeal. Hoover then filed this petition for a writ of habeas corpus in United States District Court.

ted by principals John Oscar Young, Calvin Sellars, and Samuel Spivey.[2] Hoover has appealed from the denial of his petition for habeas corpus by the United States District Court for the Southern District of Texas, Houston Division. The District Court's opinion is reported as Hoover v. Beto, S.D.Tex. 1969, 306 F.Supp. 980.

On appeal Hoover has asserted two claims of error to the denial below of his habeas corpus petition based on federal constitutional grounds. First, he contends that the Court erred in refusing to sustain alleged violations of his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure. The State Trial Court admitted into evidence two diamonds seized from Hoover's home during a nighttime search conducted by the Houston Police Department. Hoover argues that the search was made without his voluntary consent, by police officers acting under color of a search warrant which was invalid under Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Secondly, Hoover asserts that his right to confrontation under the Sixth and Fourteenth Amendments was infringed when the State Trial Court admitted into evidence the oral confession of alleged principal and coindictee Calvin Sellars. The confession, which also implicated Hoover as an accomplice, was admitted during the testimony of Officer C. V. Stone to whom Sellars confessed, pursuant to a well-established Texas exception to the hearsay rule which allows the confession of a principal to be admitted at the trial of an accomplice to prove the principal's guilt, proof of such guilt being a necessary prerequisite to conviction of an accomplice to the offense.

The panel of this Court which originally heard the case decided in Hoover's favor on both claims of error, reversed the judgment of the District Court denying Hoover's petition for habeas corpus, and remanded the case with directions to grant the writ and discharge Hoover, unless the State elected to retry him within a reasonable time. Hoover v. Beto, 5 Cir., 1971, 439 F.2d 913. Pursuant to Rule 35 of the Federal Rules of Appellate Procedure, the case was placed en banc by the Court. Upon rehearing en banc, after careful consideration of the issues presented and review of the entire record before us, a majority of this Court is of the opinion that the panel decision should be reversed, and the judgment of the District Court denying Hoover's petition for a writ of habeas corpus is therefore affirmed.

## I.

## THE SEARCH AND SEIZURE ISSUE

The facts and circumstances surrounding the search of Sam Hoover's home and seizure therefrom of two diamonds stolen from the Schepps' residence are uncontroverted. They are stated in the original panel's opinion, Hoover v. Beto, 439 F.2d at 916–918, and will be only briefly summarized here.

Officer Hodges testified that during the early morning hours of March 18, 1964, in the company of nine other law enforcement officers and the Justice of the Peace who had issued a search warrant for the search in question, he went to Hoover's home, knocked, and Hoover answered the door. Hodges announced who he was and that he had a warrant to search his home. Hoover told him "that the search warrant was unnecessary, for [him] to come on in his house and look wherever [he] pleased." None of the officers was in uniform, but sev-

---

2. In separate trials Young and Sellars were found guilty by a jury as principals and sentenced to death. Their convictions were affirmed on appeal. See Young v. State, Tex.Cr.App.1965, 398 S.W.2d 572; Sellars v. State, Tex.Cr. App.1965, 400 S.W.2d 559. Sellars was denied habeas corpus relief in Texas State Courts, in Federal District Court, and by us. See Sellars v. Beto, 5 Cir., 1970, 430 F.2d 1150. Samuel Spivey, indicted as a principal, was granted immunity from prosecution for his testimony against Hoover.

eral of them would have been well known to Hoover because of his criminal law practice in the Houston area. Hodges had the warrant in his hand when he knocked on the door. Hoover asked to see the warrant after Hodges was inside. The State Trial Court upheld the search on the ground that "Sam Hoover said it's not necessary to have a search warrant, come on in and search the residence."

There is no dispute as to what happened and what was said. The controversy concerns inferences and conclusions to be drawn from a known set of facts. Appellant acknowledges that the words he spoke constituted an invitation to the police to enter and search. Nevertheless, he argues in reply brief on rehearing that

> "The invitation which appellant extended to the searching officers to come into his home upon his being presented with that misrepresentation [the allegedly invalid search warrant] was induced by, and solely a product of, that misrepresentation.

> "Therefore any consent evidenced by that invitation could not have wholly been a product of the appellant's free will."

There is no affirmative evidence in the record to support the contention that the invitation was actually involuntary. Hoover did not testify at the voir dire hearing pertaining to the validity of the search when the matter was considered out of the presence of the jury during his trial in State Court, or in the proceedings below on his petition for habeas corpus.[3] Rather, we are asked to draw the inference that the statement of Officer Hodges that he had a warrant weakens the meaning of Hoover's subsequent words of invitation and the intent which those words convey in the ordinary course of human experience—namely, consent.

The State Trial Judge ruled that the words uttered by Hoover meant that Hoover was inviting the police officers to search his home, without reference to any search warrant which they possessed.[4] The District Court below felt that while it was not bound by the findings of the State Trial Court, those findings were nevertheless entitled to great weight. 306 F.Supp. at 987. Independently, the District Court below held that the evidence was uncontradicted and established that Hoover not only consented to the search, but even invited it. The Court pointed out that the Texas Court of Criminal Appeals also found that there was invitation to search (390 S.W. 2d at 762), which finding of fact affirmed the State Trial Court's ruling.

■ Whether consent to search has been given is a question of fact. We only recently passed on this question in United States v. Resnick, 5 Cir., 1972, 455 F.2d 1127, where Judge Godbold noted that

> "The District Judge found, on conflicting testimony, that Carlton did consent. We cannot say that this was plainly erroneous, which is our scope

---

3. The Federal District Court noted that "The factual basis for [Hoover's] contentions is to be determined from the record as both parties elected not to present further evidence at the hearing granted by the Court." 306 F.Supp. at 982–983.

4. The pertinent part of the State Trial Court's ruling is as follows:
"Counsel, this witness has testified that this was the home of Sam Hoover. That upon knocking on the door, the testimony is Sam Hoover came to the door. The officers informed him they had a search warrant and Sam Hoover said it's not necessary to have a search warrant, come on in and search the residence. I overrule your objection.
\* \* \* \* \*
"The Court's reasoning on this matter is I think there is a complete distinction between a submission or an acquiescence or an invitation. On the other hand, an invitation. You have recited to this Court about so many officers being there and what they had in mind. What this Court thinks the proper thing is what did Sam Hoover have in mind. The evidence reflects he is an attorney who tries many criminal cases. Here is a defendant who comes and says a search warrant is unnecessary, come in."

of review of facts found at a motion to suppress hearing."

455 F.2d at 1133. See also United States v. Gunn, 5 Cir., 1970, 428 F.2d 1057; United States v. Montos, 5 Cir., 1970, 421 F.2d 215, cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). Hoover places much reliance on Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In *Bumper*, the Supreme Court, through Mr. Justice White, stated:

> "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all."

391 U.S. at 548–550, 88 S.Ct. at 1792. The holding of the case, however, was much narrower and was obviously based on its particular facts, since the Court said:

> "We hold that Mrs. Leath did not consent to the search, and that it was con-

stitutional error to admit the rifle in evidence against the petitioner. . . ."

391 U.S. at 550, 88 S.Ct. at 1792.

■ The majority holding in *Bumper* was undoubtedly based on strong circumstances.[5] Our own view of the testimony is that when attorney Sam Hoover told Police Officer Hodges that his warrant was not necessary and to come on into his home and search wherever he wanted, this constituted clear and convincing evidence of voluntary consent to the search, irrespective of the validity of the warrant. Hoover voluntarily consented to and invited the search. That consent was neither coerced nor compelled by the search warrant. The argument that express declarations of invitation and consent, such as were present here, constitute nothing "more than acquiescence to a claim of lawful authority" neither comports with reason and logic nor with human experience and common sense.

The Texas State rule of law prior to *Bumper* was not substantially different from the principles upon which *Bumper* is based. In Stanford v. State, 1942, 145 Tex.Cr.R. 306, 167 S.W.2d 517, on which the Texas court relied to find consent, the Texas Court of Criminal Appeals stated:

> "This court has frequently held that when a party was advised that officers had a warrant to search the premises

---

5. In Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), a .22 caliber rifle was introduced at the defendant's trial which was allegedly used in the commission of the crime (rape). The evidence was seized from the residence of defendant's grandmother,

> " . . . a 66-year-old Negro widow, in a house located in a rural area at the end of an isolated mile-long dirt road. Two days after the alleged offense but prior to the petitioner's arrest, four white law enforcement officers—the county sheriff, two of his deputies, and a state investigator—went to this house and found Mrs. Leath there with some young children. She met the officers at the front door. One of them announced, 'I have a search

warrant to search your house.' Mrs. Leath responded, 'Go ahead,' and opened the door." 391 U.S. at 546, 88 S.Ct. at 1790.

Mrs. Leath testified at a hearing on defendant's motion to suppress:

> "Four of them came. I was busy about my work, and they walked into the house and one of them walked up and said, 'I have a search warrant to search your house,' and I walked out and told them to come on in. * * * He just come on in and said he had a warrant to search the house, and he didn't read it to me or nothing. So, I just told him to come on in and go ahead and search, and I went on about my work. I wasn't concerned what he was about. I was just satisfied." 391 U.S. at 546–547, 88 S.Ct. at 1790.

the mere statement of the party that it was all right to go ahead was not regarded as a waiver of the right to question the regularity of the warrant nor of consent to the search. * * * On the other hand, where the party tells the officer that a warrant to search is unnecessary, and no issue is made on the question, consent is shown. * * * The question turns on the point as to whether the party really gives consent for the search, or merely acquiesces in the officer pursuing his legal rights under a valid warrant." Id. 167 S.W.2d at 519. [Citations omitted.]

In *Stanford,* after the officer told defendant that he had a warrant, defendant stated that it was not necessary to have a warrant and "to go any place in the hotel [he] wanted to go." Id. at 519. The Court held that the defendant had consented to the search and that the consent operated as a waiver of the right to object to the validity of the warrant. That was the situation here, and it is apparent the circumstances differ from those in *Bumper.*

As the District Court below expressed it:

"In *Bumper* the party in question was a 66 year old Negro widow of patently limited education who was neither suspect at the time nor an eventual defendant in the criminal proceedings. Petitioner here was himself a lawyer with extensive experience in criminal law and its practical realities. While this is not necessarily a controlling distinction here, it is a circumstance."

306 F.Supp. at 986.

■ Furthermore, we hold that the search of Hoover's home was not constitutionally invalid because of Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The State of Texas concedes that if *Aguilar* applies to the search of Hoover's home, the affidavit supporting the search warrant does not meet the probable cause standards prescribed by *Aguilar.* The State argues, however, that *Aguilar* does not ap-

ply to the search in question which occurred about three months before *Aguilar* was decided on June 15, 1964. The original panel held that "Hoover need not rely on *Aguilar* retroactively since he had not been tried and convicted when the decision in *Aguilar* was rendered." 439 F.2d at 917. Subsequent to the panel decision, however, the Supreme Court decided Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), which held that a prior decision which narrows the scope of permissible searches is not to be retroactively applied to searches conducted prior to the date of decision. Thus, because the Hoover search was made prior to the Supreme Court's decision in *Aguilar,* it is not affected thereby. The panel's holding that the search of Hoover's home was constitutionally invalid is expressly rejected by us.

## II.

### THE CONFRONTATION ISSUE

The Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." The Supreme Court in Pointer v. State of Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), held that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." At Hoover's trial, the State Trial Judge admitted into evidence the oral confession of Calvin Sellars through the testimony of Houston Police Officer Stone. The confession made reference in part to alleged accomplice Hoover's participation in the crime committed by principals Young, Spivey, and Sellars. The confession was admitted pursuant to Texas law on the basis of a well-established exception to the hearsay rule. Hoover contends, however, that he was denied the right to confront and cross-examine Sellars, the confessor, all in violation of the Sixth and Fourteenth Amendments. After careful considera-

tion of the record, we hold that under the facts and circumstances before us, Hoover's Sixth and Fourteenth Amendment rights were not violated. See California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213 (1970). Moreover, if there was error of constitutional proportions, the record shows that it was harmless beyond a reasonable doubt. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## A. BACKGROUND

█ Hoover was indicted as an accomplice to the robbery for which Sellars, Young, and Spivey were indicted as principals.[6] Under Texas law, in order to convict an accomplice, the State must sustain a two-fold burden of proof. It must first prove beyond a reasonable doubt that the principals were guilty of the crime alleged in the indictment.[7] Then it must prove beyond a reasonable doubt that the alleged accomplice, before the robbery, advised, commanded, or encouraged his co-indictees to commit the offense and that he was not present at the time of its commission.

The Texas rule of evidence before us is particularly tailored to the foregoing substantive rule of criminal law and is an exception to the hearsay rule, having been fashioned by judicial decisions of Texas courts dating from at least 1881.[8]

6. The first count of the indictment charged Hoover as a principal. This count was not submitted to the jury. The second count charged Hoover as an accomplice. The definitions of the crime of robbery and of accomplice under Texas law are set out in the panel's opinion. 439 F.2d at 915 n. 1. Only the second count was submitted to the jury. In relevant part it reads:

"... that [Young, Spivey and Sellars], on or about the 11th day of March, A.D. 1964, in said County and State, did in and upon Mair Schepps make an assault, and did then and there by said assault and by violence and by putting [him] in fear of life and bodily injury, and by then and there using and exhibiting a firearm, to-wit, a pistol, fraudulently and against the will of the said Mair Schepps take from the person and possession of the said Mair. Schepps [certain property—description herein omitted] the same being then and there the corporeal personal property of [Schepps] with the intent then and there to deprive [him] of the value of the same and to appropriate it to the use of them [Young, Spivey and Sellars], and that SAM HOOVER, on or about the 11th day of March, A.D. 1964, ... prior to the commission of the aforesaid offense ... did unlawfully and wilfully advise, command, and encourage the said [Young, Spivey and Sellars] to commit said offense, the said SAM HOOVER not being present at the time of the commission of the aforesaid offense by [Young, Spivey and Sellars]."

7. "An accomplice under our Code is the same as an accessory before the fact by the common law with very much the same criminal procedure. In order to convict the accomplice, the State must prove the guilt of the principals and that the accomplice advised, commanded, or encouraged the principals to commit the offense. There are two separate and distinct propositions demanding full proof of the State. The principals not having been tried and convicted, so that the record of their conviction could be introduced to establish their guilt, the State was required to establish their guilt in the same manner and to the same certainty as if they themselves had been upon trial; for their guilt must be shown before the accomplice can be legally convicted."

Arnold v. State, 9 Tex.App. 435, 438 1880). See also Tucker v. State, Tex., Cr.App.1971, 461 S.W.2d 630.

8. See Simms v. State, 1881, 10 Tex.App. 131; Blumann v. State, 1893, 33 Tex.Cr. R. 43, 21 S.W. 1027, Bluman v. State, 1893, 33 Tex.Cr.R. 43, 26 S.W.2d 75 (on rehearing); 26 S.W. 75; Millner v. State, 1914, 75 Tex.Cr.R. 22, 169 S.W. 899; Sapp v. State, 1919, 87 Tex. Cr. R. 606, 223 S.W. 459; Smith v. State, 91 Tex.Cr.R. 15, 237 S.W. 265 (1922); Longoria v. State, 1954, 159 Tex.Cr.R. 529, 265 S.W.2d 826; Crook v. State, 1889, 27 Tex.App. 198, 11 S.W. 444; Hamlin v. State, 1898, 39 Tex.Cr.R. 579, 47 S.W. 656; Espalin v. State, 1921, 90 Tex.Cr.R. 625, 237 S.W. 274; Browney v. State, 1934, 128 Tex.Cr.R.

In Browney v. State, 1934, 128 Tex.Cr.R. 81, 79 S.W.2d 311, 314, the Court stated that Texas cases which had applied the rule " . . . go no further than to give effect to the general rule that the admissions or confessions of the principal (if they would be admissible if the principal were on trial) are admissible on the trial of the accomplice, not for the purpose of proving the guilt of the accomplice, but for the purpose solely of proving the guilt of the principal." The rule is followed by courts of other jurisdictions [9] and over the years has been recognized by the commentators.[10] In

---

81, 79 S.W.2d 311; Wilkins v. State, 1937, 134 Tex.Cr.R. 452, 115 S.W.2d 907; Ex parte Suger, 1946, 149 Tex.Cr.R. 133, 192 S.W.2d 159 (bail case); Louvier v. State, 1957, 165 Tex.Cr.R. 167, 305 S.W.2d 574. Cf. Pine v. State, 1938, 134 Tex.Cr.R. 396, 115 S.W.2d 918.

9. See, e. g., Wells v. State, 194 Ga. 70, 20 S.E.2d 580 (1942), Wigmore noted that the following American jurisdictions have at one time or another followed the rule: Georgia, Colorado, Connecticut, Kansas, Nebraska, Tennessee and Washington. See Wigmore, Evidence § 1079 n. 5. England also apparently follows the rule. Rex v. Cox, 1 F. & F. 90 (1858). Cf. Rex. v. Turner, 1 Moody, Crown Cas. 347.

10. Wigmore states:
"(c) That the *confession of a principal* is admissible, on the trial of the *accessory*, to evidence the commission of the crime by the principal, seems clear on the present principle, supposing some evidence of the defendant's cooperation to be first furnished. But whether the *judgment of conviction* of the principal is receivable for the same purpose depends on the doctrine of the effect of judgments." [Citations omitted.]
IV Wigmore, Evidence § 1079(c), p. 133 (3d ed. 1940). McCormick and Ray state the rule as follows:
"Where defendant is indicted as an accomplice, on his trial the confession of the principal offender is admissible since it is necessary to prove the guilt of the principal as part of the case against the accomplice. But the use of the confession is limited to the guilt of the principal and the jury must be instructed that it is not evidence against the defendant for any other purpose." [Citations omitted.]
2 C. McCormick and R. Ray, Texas Law of Evidence § 1219 (Confession of Person Other Than Defendant), p. 97 (2d ed. 1956). See also 24 Tex.Jur.2d, Evidence § 669, p. 273 ("Where the principal is named as such in the indictment, his prior confession is admissible at the trial of an accomplice to prove his own guilt, though it is not admissible to prove the guilt of the accomplice."); and 2 Branch's Annot. Texas Penal Code § 754, p. 52, (2d ed.)

A similar Texas rule allows the confession of an alleged thief to be introduced at the trial of a person charged with receiving the stolen property for the purpose of proving the theft of the property and for that reason alone. See Donegan v. State, 1921, 89 Tex.Cr.R. 105, 229 S.W. 857; Hoyt v. State, 1921, 88 Tex.Cr.R. 612, 228 S.W. 936; Ashley v. State, 1961, 171 Tex.Cr.R. 165, 346 S.W.2d 613; Lanier v. State, 1962, 172 Tex.Cr.R. 238, 356 S.W.2d 671.

In Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, the Texas Court of Criminal Appeals again had occasion to consider this rule. In its opinion on State's motion for rehearing (432 S.W.2d at 938 et seq.), the five-man court divided three ways, the conviction of Schepps was reversed and the case remanded for a new trial. Two judges concurred in the main opinion to the effect that introduction of extrajudicial confessions of three of the alleged principals violated Schepps' constitutional right of confrontation; the third judge concurred because of failure to delete hearsay statements in the principals' written confessions implicating Schepps; and two judges dissented and adhered to the well-established Texas rule. Thus "the judges were not able to reach a consensus as to why, or under what circumstances, such confessions are not admissible." See Steele, Criminal Law and Procedure, 24 Southwestern Law Journal 229, 239. The viability of the Texas rule of law that where an accomplice is being tried separately from his principal, any evidence which would be admissible to show the guilt of the principal if he were on trial, is admissible on the trial of the accomplice for the purpose of showing the guilt of the principal, was reaffirmed in the subsequent case of Chapman v. State, Tex.Cr.App.1971, 470 S.W.2d 656, the latest Texas case we have been able to find, by Judge Onion, author of the main opinion in *Schepps*. Incidentally, the *Schepps* decision was rendered prior to the decisions of the Supreme Court in California v. Green, 399

Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, the Texas Court of Criminal Appeals noted that

"This exception is apparently bottomed on the fact that the State has the burden of proving the guilt of the principal in such case and, therefore, any testimony which would be admissible to show the guilt of the principal if he were on trial is admissible on the trial of the accomplice for the purpose of showing the guilt of the principal."

Id. at 940. See also Browney v. State, 1934, 128 Tex.Cr.R. 81, 79 S.W.2d 311, 314.

■ In Texas, the confessor must also be specifically named in the indictment as a principal.[11] The confession cannot be used as evidence against the defendant who is on trial as an accomplice and is not admissible to connect the accomplice with the offense charged against him. Cf. Pine v. State, 1938, 134 Tex.Cr.R. 396, 115 S.W.2d 918.

■ Texas has fashioned a limitation on this rule of evidence applicable when the principal's confession in some way refers to the guilt of the accomplice on trial. It was summarized in Browney v. State, supra:

"Statements in the confession of the principal which relate solely to the guilt of the accomplice, and which throw no light on the principal's actions, should be excluded. * * * However, if the expressions connecting the accomplice with the offense, when eliminated, render the confes-

sion incomplete and fragmentary, they may be received in evidence. In that event, the trial court should carefully guard the rights of the accomplice on trial by limiting the purpose of the confession to establishing the principal's guilt." [Citations omitted.]

79 S.W.2d at 314. See also Smith v. State, 1922, 91 Tex.Cr.R. 15, 237 S.W. 265, 267. The State Trial Court construed the rule to permit introduction of references which are "interwoven" with the confession of guilt of the principal.[12]

■ Superimposed on the Texas rule is the principle established in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that "A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." 378 U.S. at 380, 84 S.Ct. at 1783. In Texas, an accomplice on trial separately is entitled to defend the State's case against the principal to the same extent that he is entitled to defend the case against himself. Chapman v. State, Tex.Cr.App.1971, 470 S.W.2d 656. Pursuant to Jackson v. Denno, supra, when the State has indicated that it intends to use a confession, the Trial Court, upon timely request of the opponent of the evidence, must hold a hearing outside of the presence of the jury on the issue of voluntariness and rule on the admissibility of the confession. If the Court finds the confession involuntary, it must be excluded or the judgment against the ac-

U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

11. See Sapp v. State, 1919, 87 Tex.Cr.R. 606, 223 S.W. 459; 2 C. McCormick and R. Ray, Texas Law of Evidence § 1219, p. 97 n. 27 (2d ed. 1956); 24 Tex.Jur. 2d, Evidence § 669, p. 273. The rule has no application where the confessor is an accomplice and not a principal. Ex Parte Herring, 1932, 122 Tex.Cr.R. 57, 53 S.W. 2d 607; Louvier v. State, 1957, 165 Tex. Cr.R. 167, 305 S.W.2d 574, 577.

12. The "interwoven" test is the counterpart to the "fragmentary and incomplete" test developed in Browney v. State, 1934, 128 Tex.Cr.R. 81, 79 S.W.2d 311. See Smith v. State, 1922, 91 Tex.Cr.R. 15, 237 S.W. 265, "The fact that interwoven in the confession were expressions connecting appellant with the acts of the principal would not render the statement nonavailable to the state." Id. 237 S.W. at 267. See also Walker v. State, 1920, 88 Tex.Cr.R. 389, 227 S.W. 308, 311–312.

complice will be reversed. Chapman v. State, Tex.Cr.App.1971, 470 S.W.2d 656, 661. If the Court finds the confession voluntary, it is admitted. The defendant, of course, retains the right to attack its voluntariness before the jury. But in this instance, the attack centers on the weight and not on the admissibility of the evidence. Once the confession is admitted, the Trial Court must instruct the jury that it can only be used as evidence to prove the confessor's guilt, and cannot be considered as evidence against the defendant accomplice.

The rule was used on two occasions at Hoover's trial: first, when the written confession of John Oscar Young was introduced; secondly, when the oral confession of Calvin Sellars was introduced through the testimony of Officer C. V. Stone. Only the propriety of the use of Sellars' confession is before us for review. In each instance, the State Trial Court carefully followed the Texas rule of evidence.

Young's confession was written and the Court decided to "bracket out" those portions thereof which referred to Hoover.[13]

Subsequently, the State sought to introduce Calvin Sellars' oral confession through the testimony of Officer C. V. Stone to show Sellars' guilt as a principal. Stone was called to the stand in the presence of the jury to testify in the State's case in chief. He testified that during his investigation he had recovered a jar containing certain items of jewelry. The State had already proved that the jar and the jewelry had been stolen from the Schepps' residence. Stone testified that after his arrest, Sellars had told him the items were buried in a yard adjacent to his mother's residence. When the prosecutor called for the contents of the oral confession, the defense demanded and secured a hearing outside of the presence of the jury on voluntariness and also sought to have excluded any references to Hoover. As to references to Hoover contained in Sellars' confession, the State Trial Court ruled in accordance with Texas law and consistent with its former ruling, that

> "The ruling of this Court was the same if it was a written statement or oral confession. If the testimony or the written confession is so interwoven, this Court holds it is admissible even if it is an accomplice. In the confession of John Oscar Young, the Court held that particular paragraph was not so interwoven it could not be separated as to make the written statement intelligible, and it is an oral confession in this instance."

An extensive hearing was held on the voluntariness of Sellars' confession, at the end of which the Court ruled that the confession was voluntary and Sellars' rights were not violated.[14] The jury re-

13. According to Young's written confession, he said that on March 5, 1964, he was informed that a bookie named Schepps had $300,000 stashed in his home. On March 11, 1964, he, Spivey and Sellars drove out to the house, broke in, and commenced searching for the money. They found some money, but not the large sum. Young confessed that he "twisted the woman's arm a little" and that Sellars shocked her with an electric cord. Just before they left, Young shot Mrs. Schepps in the leg. Young stated that during the robbery when they could not find the money, he made a call to find out what to do. He was told to look in the deep freeze. He was also told that if he did not find the money there, he should leave. After the robbery, Young went home and went to sleep. He got about $1,100 for his part in the robbery.

14. The State Court also made written findings on the issue of voluntariness, which were made part of the record, as follows: "... during the trial of the above numbered and entitled cause, the State of Texas, after having laid a proper foundation, tendered into evidence an oral statement of the co-defendant Calvin Sellars, made on or about the 20th day of March, 1964.
"Thereupon the defendant Sam Hoover, who was represented by Mr. Warren Burnett and Mr. Luther Jones, both competent and experienced attorneys, had an unrestricted opportunity in a separate hearing outside the presence of

turned to the courtroom and Officer Stone resumed the stand at which time he related the substance of the confession.

Stone first identified the jar and jewelry which Sellars recovered in the back yard of his mother's residence. During this time Sellars related his part in the Schepps' robbery. Sellars told him that Young and Spivey went to the Schepps' home and robbed them. Sellars told him that he had received a phone call from Sam Hoover asking him to take part in the robbery. Thereafter, he met Spivey and Young at his house. Spivey and Young were to supply the weapons. On the day of the robbery, Young and Spivey picked up Sellars and proceeded to the Schepps' residence in Sellars' Mercury automobile. They parked the car a short distance from the scene and made their way through some bushes to the house. While they were trying to figure out a way to get inside the house, a lady (Mrs. Tuck) came out the back door. Sellars hit her with a pistol or shotgun and knocked her down. Young and Spivey went into the house. Sellars remained outside for five or ten minutes. When he got in the house things were torn up and people were scattered about. Sellars said that a shot had been fired and he thought someone had been shot. Young told him that he had fired the shot to frighten them. Sellars brought Mrs. Tuck into the house and made her sit on the floor. He tied her hands and put the Schepps' baby in her lap. Stone further testified that Sellars told him that they had alternately taken turns torturing the persons in the house since they were unable to locate the money. Sellars told Stone that they had jerked a cord from a table lamp and shocked some of the people. Young sent him downstairs to get a knife, to heat it, and bring it back. Sellars got the knife and they burned Mrs. Schepps with it, by laying the knife on her side. Sellars told Officer Stone they were looking for $300,000, which they did not find. However, Sellars told him that each robber received approximately $1,100 or $1,200 apiece from the robbery. The robbers also took several pieces of jewelry from the house. Except for one ring, Sellars kept the jewelry with him and buried this jewelry in the jar in his back yard. Sellars told Stone that when he went through the jewelry he found a necklace consisting of a small gold chain which had three diamonds on a brooch. Sellars also told Officer Stone that Young had stolen a diamond ring. When Sellars returned from the robbery with the jewelry, he called Hoover and told him that he had the articles and was going to throw them away. He was advised not to throw them away but to bring the whole lot over to Pasadena so that Hoover could examine it. After talking to Hoover, Sellars started for Pasadena. At one point he was approached by the police who "were about to arrest him." He went into a small grocery store and hid the necklace under a soap box. As he was leaving the store, he was stopped by the officers and questioned. He was not taken into custody. Sellars then told Stone that he went home and called Sam Hoover and told him he had been stopped. He told Hoover he hid the necklace in the store. He was told by Hoover to stay away from the place because he might be followed. Nevertheless, Sellars went back to the store three or four hours later and recovered the necklace. He then

the jury to raise any issues there may have been regarding whether or not the statement was voluntary and to develop factual issues surrounding the making of the statement.

"At the conclusion of all of the evidence tendered to the Court, in the absence of the jury, touching the voluntariness of the oral statement made by Calvin Sellars, the Court considered all of the evidence in the record surrounding and concerning the making of the oral statement, including the demeanor and manner of the witnesses who testified, and found there were no disputed facts concerning the voluntariness of the oral statement; that the oral statement was freely and voluntarily made without coercion, promises, threats or mistreatment. The Court further found that the constitutional rights of Calvin Sellars were in no way violated."

went to Hoover's house in Pasadena and was let in through the rear door. He showed Hoover the necklace. Hoover took the necklace and told him to sit down and wait. Hoover went outside and when he returned he handed him the mounting wrapped in a small piece of blue paper. The diamonds had been removed. Hoover told him to dispose of the mounting, which he did on the way back to Houston, by tossing it into a horse pasture from which it was not recovered. But he kept the chain from the necklace and buried it with the other items he had stolen.

Sellars also told Stone that during the robbery and after they got into the house the trio was to receive its instructions from Hoover as to how to proceed and as to where to look for the money. Sellars told him that Young called Hoover and that they received instructions and looked where they were told to look.

In his charge to the jury, the Court made the following limiting instruction:

"A conviction cannot be had upon the testimony of an accomplice unless the jury first believes that the accomplice's evidence is true and that it shows the defendant is guilty of the offense charged against him; and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense charged; and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

"You are charged that Samuel Spivey is an accomplice witness, if any offense was committed, and you are instructed that you cannot find the defendant guilty upon his testimony unless you first believe that the testimony of the said Samuel Spivey is true and that it shows the defendant is guilty as charged in the indictment; and even then you cannot convict the defendant unless you further find and believe that there is other evidence in the case, outside of the evidence of the said Samuel Spivey, tending to connect the defendant with the commission of the offense charged in the indictment; and, then, from all of the evidence you must believe beyond a reasonable doubt that the defendant is guilty.

"There has been introduced by the State in this case a written statement allegedly made by John Oscar Young. Additionally, there has been introduced into evidence by the State oral statements allegedly made to Officer C. V. Stone by Calvin Sellars. Concerning these two items of evidence, you are instructed that such evidence was admitted before you solely for the purpose of showing, if it does, that the said John Oscar Young and Calvin Sellars committed the offense of robbery by firearms as charged in the indictment. You are instructed that you cannot consider this said evidence as any evidence against the defendant.

"You are further instructed that the written statement allegedly made by John Oscar Young cannot be used to corroborate the oral statements allegedly made to Officer C. V. Stone by Calvin Sellars as to their, the said John Oscar Young and Calvin Sellars, committing, if they did, the robbery in question. You are further instructed that the oral statements allegedly made to Officer C. V. Stone by Calvin Sellars cannot be used to corroborate the written statement allegedly made by John Oscar Young as to their, the said John Oscar Young and Calvin Sellars, committing, if they did, the robbery in question.

"You are further instructed that neither the written statement allegedly made by John Oscar Young nor the oral statements allegedly made to Officer C. V. Stone by Calvin Sellars may be used to corroborate the testimony of Samuel Spivey."

## B. CONSTITUTIONAL VALIDITY OF THE TEXAS RULE

The Texas rule permitting introduction of a principal's oral or writ-.

ten confession at the trial of an accomplice to prove the guilt of the principal when the confession does not implicate the accomplice does not violate the Sixth Amendment.[15] The question before us, however, is whether the Sixth Amendment made obligatory on the States by the Fourteenth Amendment, Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), is violated by the introduction of a principal's confession which also implicates the accomplice. As a general rule, the whole of a confession should be introduced, unless parts of it, reflecting the commission of other crimes, for example, can be excluded without damaging the whole. See 2 Wharton's Criminal Evidence § 361, pp. 68–74 (12th ed. 1955). Wigmore calls the rule the "principle of completeness." "It is commonly said that the *whole of the confession or admission* must be taken together . . . ." VII Wigmore, Evidence § 2100(c), p. 493. Cf. United States v. Wenzel, 4 Cir., 1962, 311 F.2d 164. However, Wigmore notes that because confessions are ordinarily not admissible against third persons, "the *names of other co-indictees* mentioned in a confession used and read against the party making it, were by most English judges ordered to be omitted. But by other judges the names were ordered read and the jury instructed not to use the confession against them. In Canada and the United States the latter practice is favored." VII Wigmore, Evidence § 2100(d), p. 496.

Texas has adopted a combination of both practices, deleting or editing parts and relying upon specific instructions to remedy the remainder. If the principal's confession contains parts which tend solely to implicate the accomplice, these parts should be excluded. If the principal's confession contains portions which, while they tend to implicate the accomplice are nevertheless so interwoven with the confession of the guilt of the principal as not to permit a deletion without confusing or obscuring the substance of the confession, these portions are admissible. In either case, the jury must be instructed that the evidence is admissible only against the principal, and cannot be used as evidence against the accused.

This Court has specifically approved the use of otherwise admissible confessions where references to codefendants have been deleted, for the situation is the same as if no incriminating statements existed initially. Posey v. United States, 5 Cir., 1969, 416 F.2d 545, 551. See also United States v. Sims, 5 Cir., 1970, 434 F.2d 258, 259; Menendez v. United States, 5 Cir., 1968, 393 F.2d 312; Barton v. United States, 5 Cir., 1959, 263 F.2d 894; Calloway v. United States, 1968, 130 U.S.App.D.C. 273, 399 F.2d 1006, 1008, cert. denied, 393 U.S.

---

15. Mr. Justice Brennan, writing for the majority in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), noted that "If it were true that the jury disregarded the reference to the co-defendant, no question would arise under the Confrontation Clause, because by hypothesis the case is treated as if the confessor made no statement inculpating the nonconfessor." 391 U.S. at 126, 88 S. Ct. at 1622. If a principal's confession makes no reference to an accomplice, no constitutional question arises. Later in the opinion, Mr. Justice Brennan wrote that "Evans' oral confessions were in fact testified to, and were therefore actually in evidence. That testimony was legitimate evidence against Evans and to that extent was properly before the jury during its deliberations." Id. at 127, 88 S.Ct. at 1623. Similarly, in White v. United States, 5 Cir., 1969, 415 F.2d 292, cert. denied, 397 U.S. 993, 90 S.Ct. 1128, 25 L. Ed.2d 400 (1970), an oral confession of codefendant Metz was introduced at the joint trial of Metz and White. We found that "Since Metz's confession did not implicate or inculpate White, it follows that White was not denied his right of confrontation." 415 F.2d at 294. See also Brooks v. United States, 5 Cir., 1969, 416 F.2d 1044, 1051; Wapnick v. United States, 2 Cir., 1969, 406 F.2d 741, 742; United States v. Lipowitz, 3 Cir., 1969, 407 F.2d 597, 601–603; United States v. Levinson, 6 Cir., 1968, 405 F.2d 971, 987–988; Slawek v. United States, 8 Cir., 1969, 413 F.2d 957, 960–964 (per the Judge, now Justice Blackmun); United States v. Santos, 9 Cir., 1970, 430 F.2d 1295.

987, 89 S.Ct. 464, 21 L.Ed.2d 448 (1968); Comment, Hearsay, The Confrontation Guarantee and Related Problems, 30 La. L.Rev. 651, 665 (1970). Texas, however, permits inculpatory references against an accomplice to be heard by the jury, subject to limiting instructions by the court to regard the whole confession as evidence only against the declarant confessor. The issue is whether admission of Sellars' oral confession violated Hoover's Sixth and Fourteenth Amendment rights. We hold that it did not.

 The panel concluded that "No instructions to the jury could have eliminated the damaging and prejudicial effect on the defense." 439 F.2d at 923. The panel cited no authority for the holding. Indeed, the holding is valid only if Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is applicable. *Bruton* was not cited by any of the parties hereto nor by the panel. *Bruton* held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." 391 U.S. at 126, 88 S.Ct. at 1622. *Bruton*, however, is distinguishable from the situation here. Hoover's trial was not a joint trial. Two defendants were not being tried side by side as they were in *Bruton*. Only Hoover was on trial, having been granted a severance from the principals. Trial of principals and accomplices is inherently different from a trial of coconspirators or codefendants. While coconspirators are coequals in crime as a matter of substantive criminal law, principals and accomplices are not. Further, in this case the State was required to prove Sellars' guilt as a prerequisite to the conviction of Hoover as an accomplice; there was no such prerequisite in *Bruton*.

Finally, an examination of the testimony taken during the voir dire examination of certain prospective jurors on which the defendant took a bill of exception shows extensive questioning of virtually every juror as to his ability to consider confessions as evidence only in accordance with the Court's instructions. Nothing in this record convinces us that they did not.

In short, we do not think that it was unreasonable for the State Trial Judge to conclude, in the exercise of reasonable discretion, that a limiting instruction to the jury could take care of any possible adverse effect, because of the admission of Sellars' oral confession.

*Pointer* and its progeny have resulted in numerous confrontation clause challenges to established laws of evidence.[16] The cases have created an unsettling effect on the law of evidence.[17] However,

16. See Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

The attack is not restricted to hearsay evidence alone. For example, we recently rejected a claim under the "Best Evidence Rule" "that the admission of the testimony [that a shirt had the initials D–U–F inscribed on the collar] without the production of the shirt denied the appellant his right to cross-examination." United States v. Duffy, 5 Cir., 1972, 454 F.2d 809, 813. See also United States v. Williams, 5 Cir., 1972, 456 F.2d 217.

17. See generally Comment, The Confrontation Test for Hearsay Exceptions: An Uncertain Standard, 59 Calif.L.Rev. 580 (1970); F. Read, The New Confrontation-Hearsay Dilemma, 45 S.Calif.L.Rev. 1 (1972); E. Griswold, The Due Process Revolution and Confrontation, 119 U.Pa.L.Rev. 711 (1971); Comment, Confronta-

in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), and Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court has now delineated a working theory of the role of the confrontation clause in the law of evidence, particularly with regard to the validity of constitutional claims which allegedly arise when hearsay evidence is admitted, either in accordance with recognized exceptions or in violation thereof. See also Gelhaar v. State, 41 Wis.2d 230, 163 N.W.2d 609 (1969), cert. denied, 399 U.S. 929, 90 S.Ct. 2250, 26 L.Ed.2d 797 (1970).

In California v. Green, supra, the Supreme Court was confronted with a Sixth (through Fourteenth) Amendment challenge to a California statute that permitted introduction of prior inconsistent statements of a witness, not just for purposes of impeachment, but for the truth of the matters declared. The California Supreme Court ruled the statement inadmissible under the Sixth Amendment because no opportunity for cross-examination had been afforded at the time the statement was made. The Supreme Court of the United States reversed the judgment. Mr. Justice White wrote for the majority:

"Our task in this case is not to decide which of these positions, purely as a matter of the law of evidence, is the sounder. The issue before us is the considerably narrower one of whether a defendant's constitutional right 'to be confronted with the witnesses against him' is necessarily inconsistent with a State's decision to change its hearsay rules to reflect the minority view described above."

399 U.S. at 155, 90 S.Ct. at 1933. The Supreme Court approved the California rule because the declarant's appearance at trial subject to cross-examination "will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." 399 U.S. at 161, 90 S.Ct. at 1936. The Court, however,

tion and the Hearsay Rule, 75 Yale L.J. 1434 (1966) ; The Supreme Court Review (1970) at 39; D. Seidelson, Hearsay Exceptions and the Sixth Amendment, 40 Geo.Wash.L.Rev. 76 (1971) ; Supreme Court Review: Confrontation, 62 J. of Crim.L., Criminology & Police Science 516 (1971) ; E. Colvin, Jr., Criminal Law & Procedure, 23 S.W. L.J. 223, 232 (1969) ; Comment, Hearsay, The Confrontation Guarantee and Related Problems, 30 La.L.Rev. 651 (1970) ; Comment, Hearsay Rule and the Right to Confrontation: State's Leeway in Formulating Evidentiary Rules, 40 Fordham L.Rev. 595 (1972) ; D. Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378 (1972) ; The Supreme Court 1970 Term, 85 Harv.L.Rev. 3, 189 (1971) ; Comment, Co-Parties: Use of Admissions and Declarations Against Interest, 3 John Marshall J. 364 (1970) ; M. Larkin, Right of Confrontation: What Next?, 1 Tex.Tech.L.Rev. 67 (1969) ; G. Marer, Right of Confrontation and Prior Consistent Statements in Criminal Cases: The California View, 45 Calif.S.B.J. 312 (1970) ; Comment, Hearsay and the Right of Confrontation in Administrative Hearings, 48 N.C.L.Rev. 608 (1970) ; E. Semerjian, Right of Confrontation, 55 A.B.A.J. 152 (1969) ; Comment, Confrontation: Prior Testimony, Confessions, and the Sixth Amendment, 36 Tenn.L.Rev. 382 (1969) ; D. Snow, Co-Conspirators Exception to the Hearsay Rule: Procedural Implementation and Confrontation Clause Requirements, 63 J.Crim.L. 1 (1972).

Casenotes on Dutton v. Evans, supra, are found at 85 Harv.L.Rev. 188 (1971) ; 22 Case W.Res.L.Rev. 575 (1971) ; 40 U.Cin.L.Rev. 402 (1971) ; 22 Mercer L. Rev. 791 (1971) ; 49 N.C.L.Rev. 788 (1971) ; 59 A.B.A.J. 169 (1971) ; 19 Kan.L.Rev. 533 (1971) ; 20 Buffalo L. Rev. 207 (1970). Casenotes on California v. Green, supra, are found at 56 A.B.A.J. 1096 (1970) ; 35 Albany L.Rev. 397 (1971) ; 37 Brooklyn L.Rev. 207 (1970) ; 39 Geo.Wash.L.Rev. 415 (1970) ; 84 Harv.L.Rev. 108 (1970) ; 2 Loyola U.L. J. 238 (1971) ; 32 Ohio S.L.J. 188 (1971) ; 5 Suffolk U.L.Rev. 337 (1970) ; 2 Tex.Tech.L.Rev. 299 (1971) ; 1970 Utah L.Rev. 688 (1970) ; and 23 Vand. L.Rev. 1365 (1970). Bruton v. United States, supra, has been noted at 35 Brooklyn L.Rev. 139 (1968) ; 35 Mo.L.Rev. 125 (1970) ; 8 Washburn L.J. 381 (1969) ; 1970 Duke L.J. 329 (1970) ; 44 St. John's L.Rev. 54 (1969) ; and 14 Vill.L. Rev. 132 (1968).

noted that because the hearsay declarant was present and testifying in the case, that "We have no occasion in the present case to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay 'exceptions' permitting the introduction of an absent declarant's statements." Id. at 162, 90 S.Ct. at 1937. The late Mr. Justice Harlan, in his concurring opinion in California v. Green, 399 U.S. at 172, 90 S.Ct. at 1942, pointed out the dangers of indiscriminately equating "confrontation" with "cross-examination."

> "If 'confrontation' is to be equated with the right to cross-examine, it would transplant the ganglia of hearsay rules and their exceptions into the body of constitutional protections. The stultifying effect of such a course upon this aspect of the law of evidence in both state and federal systems need hardly be labored, and it is good that the Court today, as I read its opinion, firmly eschews that course."

Another important case on this question arose later in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), which emanated from this Circuit. In Dutton, Mr. Justice Stewart's plurality opinion marked a new stage in the development of the theory of the confrontation clause in relation to rules of evidence. Mr. Justice Stewart recognized "that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots. But this Court has never equated the two, and we decline to do so now." 400 U.S. at 86, 91 S.Ct. at 218. Rather, "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' California v. Green, 399 U.S., at 161, 90 S.Ct., at 1936." 400 U.S. at 89, 91 S.Ct. at 220. In Dutton, certain indicia of reliability of the state-

ment offered by testimony other than that of the declarant himself provided the satisfactory basis for its admissibility.

■ When Dutton was before us, Judge Gewin wrote for the Court that "when rational substitutes for the benefits of confrontation actually exist, there is no reason to exclude hearsay evidence. Although we express no view as to the constitutional validity of any exception to the confrontation requirement which has not been ruled upon, it is important to point out that generally recognized exceptions to the hearsay rule have developed from a painful process of rationalizing the denial of confrontation." 5 Cir., 400 F.2d 826 at 830. But the process of rationalization of the denial of cross-examination has as its genesis the substitution of that satisfactory basis for evaluating the truth of the prior statement to which Mr. Justice Stewart referred, which is itself "confrontation." Thus it is that confrontation is broader than cross-examination. Cross-examination, notes Wigmore in an oft-quoted statement, "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." V Wigmore, Evidence § 1367, p. 29 (3d ed. 1940). But to hold that it is the only method to discover the truth would create an absolute barrier to the admission of any hearsay evidence. It is obvious that if the framers of the Constitution had desired to protect a right of "cross-examination" rather than "confrontation" the Sixth Amendment would have been drafted to that effect. Under Dutton, the mission of the confrontation clause is to assure that the trier of fact is provided with a satisfactory basis for evaluating the truth of the evidence presented to it, whether the evidence is hearsay or non-hearsay and whether the satisfactory basis is provided by cross-examination or otherwise. The Sixth Amendment is violated where there is no satisfactory basis.[18]

---

18. Solicitor General Ernest Griswold, reflecting on Dutton, writes:

"Our experience with the sixth amendment has taught us that it does not

Neither the Sixth nor the Fourteenth Amendment is violated when hearsay evidence is admitted in accordance with recognized exceptions to the hearsay rule because the fundamental values and notions which are the foundation for the exception and which permit its introduction as a matter of the law of evidence also satisfy the Sixth Amendment's demand for indicia of reliability. A satisfactory basis for evaluating the truth of the hearsay statement is afforded by presumed trustworthiness which results from common sense recognition of basic characteristics of human nature underlying most exceptions to the hearsay rule. For example, spontaneous exclamations are admissible on the assumption that "when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood, and 'the truth will out.' " 1 C. McCormick and R. Ray, Texas Law of Evidence § 913, pp. 683–684 (2d ed. 1956). Similarly, confessions and other declarations against interest are admissible on the assumption that men do not state facts contrary to their own interest in the ordinary course of events. Other such assumptions underlie most of the recognized exceptions. The trier of fact in either case remains the ultimate judge of the reliability of and the weight to be accorded to the evidence ruled admissible.

Where hearsay evidence is admitted, the record must affirmatively show those indicia of the statement's reliability and trustworthiness which in turn serve as adequate substitutes for the right of cross-examination. The Solicitor General of the United States suggests that Dutton v. Evans "is basically a decision in the realm of constitutional method, and specifically in the area of federal-state relationships. It may fairly be said that there is more chance of achieving justice through Dutton v. Evans than through a decision which would have solidified the law of evidence in all the states into a federal mold." E. N. Griswold, The Due Process Revolution and Confrontation, 119 U.Pa.L.Rev. 711, 727–728 (1971). Indeed, in California v. Green, supra, Chief Justice Burger (concurring) emphasized "the importance of allowing the States to experiment and innovate, especially in the area of criminal justice. If new standards and procedures are tried in one State their success or failure will be a guide to others and to the Congress." [19] 399 U.S. at 171, 90 S.Ct. at 1941.

Voluntariness is the first and foremost safeguard and "indicia of reliability" of a confession. Here, Sellars' confession was found to be voluntary after a full hearing on that issue.[20] But

mean what it says. Despite the constitutional provision, it is not the applicable law that the accused is entitled in all circumstances to confront the witnesses against him. Like all good constitutional provisions, the crisp language of the confrontation clause turns out to be somewhat cryptic. It requires thoughtful consideration and application in the light of its historical origins and the general approach of the common law to evidence problems."

E. Griswold, The Due Process Revolution and Confrontation, 119 U.Pa.L.Rev. 711, 728 (1971).

19. The Chief Justice also said:
"The California statute meets the tests of the Sixth and Fourteenth Amendments, and accordingly, the wisdom of the statute is properly left to the State

of California; other jurisdictions will undoubtedly watch the experiment with interest. The circumstances of this case demonstrate again that neither the Constitution as originally drafted, nor any amendment, nor indeed any deed, dictates that we must have absolute uniformity in the criminal law in all the States. Federal authority was never intended to be a 'ramrod' to compel conformity to nonconstitutional standards."

399 U.S. at 171–172, 90 S.Ct. at 1942.

20. Sellars' confession was found to be voluntary at the Jackson v. Denno-type hearing at Hoover's trial. The confession was also found to be voluntary at Sellars' trial, which determination was affirmed on appeal. Sellars v. State, Tex.Cr.App.1965, 400 S.W.2d 599, 562–563. The confession

voluntariness alone is not enough to establish the competency and trustworthiness of the evidence. The confession must also be corroborated. Wharton states that "According to the overwhelming weight of authority, the evidence corroborating the confession must relate to and tend to establish the corpus delecti." 2 Wharton's Criminal Evidence § 394, p. 134 (12th ed. 1955).

At Hoover's trial, Sellars' confession of his own guilt which also implicated Hoover was amply corroborated by the testimony of other witnesses and by physical evidence introduced. There can be no doubt that there was "substantial independent evidence which would tend to establish the truthworthiness of the statement." Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954).

## C. HARMLESS ERROR BEYOND A REASONABLE DOUBT

■ Spivey's amply corroborated testimony was the heart of the case against Hoover. His testimony together with other evidence, when considered apart from the incriminating portions of Sellars' confession, made the State's case against Hoover overwhelming. Spivey testified that he had known Hoover since 1961. He testified that he went to the Schepps' residence on the night of March 11, 1964, in the company of Young and Sellars, for the purpose of robbing them. Spivey went to Hoover's home. He was let in the front door and directed to Hoover's garage apartment known as the "dog house." There he met Young and Hoover to plan the robbery. Hoover told them to "get you a car and equipment [his guns] and get ready to go in." He told Spivey that Mrs. Schepps was a "hard case" and would not want to give up the money—to "use your own judgment on what to do." Spivey and Young left to look for a car which they could steal to use in the Schepps' robbery. They did not find one. Nevertheless, they drove to

the Schepps' home and tried to enter. When they failed, they returned to Hoover's home. They told Hoover they needed another man to do the job. Hoover made a call and got Calvin Sellars' address. Hoover told Spivey and Young that Sellars was the only one on the streets who was robbing.

Spivey related that on the night of the robbery, prior to going to the Schepps' home, he called Hoover to tell him that they were going in and that he would call him when the robbers got ready to leave. The trio, Young, Sellars and Spivey, traveled to the Schepps' residence in Sellars' 1956 Mercury and parked on a side street near the house. After parking, the robbers sneaked up to the house and considered how to enter. Then Mrs. Tuck came out. Sellars grabbed her and when she started screaming, Spivey hit her in the head with his shotgun and knocked her over. Sellars remained behind with Mrs. Tuck while Spivey entered through the back door and went upstairs. Young followed. Mr. Schepps was coming through the door as Spivey entered the bedroom. Spivey hit him and knocked him back against the wall. Thereafter, the victims were taped up and the torture commenced. The robbers periodically searched for money and alternatively tortured the victims. Hoover had told them there was $300,000 in the house. Hoover had not told them where it was. He gave a few suggestions on where to look: in the deep freeze, on the shelves in the kitchen, in drawers, and for a safe.

During the commission of the crime Spivey and Young telephoned Hoover for additional instructions on where to search for the money, which was never found. Spivey testified that he listened to the conversations with Hoover on a "little gold phone in the bathroom." Spivey testified that Young called Hoover first and identified himself. Hoover asked what the phone number was. Young gave him the number and Hoover

---

was found to be voluntary for the third time in Sellars' federal habeas corpus proceedings in United States District Court, which determination was affirmed on appeal to us. Sellars v. Beto, 5 Cir., 1970, 430 F.2d at 1150, 1153.

called back. Spivey recognized the voice as that of Hoover. He had talked to Hoover on the phone on other occasions. When Hoover returned the call, Young asked him where he wanted them to look. Hoover said to check the attic and a number of other places. Young asked Hoover what he wanted to do about the "old lady," Mrs. Schepps, because she would not tell where the money was. Hoover replied, "Use your own judgment, she is a hard case, she's been in the business a long time." Young asked Hoover if he wanted them "to kill them now, you know, to scare the people." Spivey hung up before he heard the response.

Each of the three victims heard parts of the conversations. Mrs. Tuck testified that one of the masked robbers placed a call and told "whoever he was talking to on the phone they had not found the big money and he said do you want me to kill them now . . . ." Subsequently, the man gave instructions to be sure to search the deep freeze. Mr. Schepps heard one call, after which "he went to giving them instructions, the others, his friends . . . to look for the money upstairs, not downstairs." Mrs. Schepps, lying near the phone, testified that she actually overheard the instructions being given, although she could not identify the voice.

Spivey testified that after the robbery, the three fled to a little drive-in. They argued all the way over there about the shooting. They split up the money and continued to argue. Spivey went inside to get some cigarettes. When he returned, Young told him that he had just spoken to Hoover who told Young to bring the five-carat diamond to him. The last time Spivey saw the diamond ring was when he gave it to Young, immediately after the robbery. A couple of days after the robbery, Spivey saw Hoover at a drive-in restaurant, where he talked with him about the robbery. Hoover showed him a police report stating that somebody else was under investigation for the crime, implying that Spivey was safe. Spivey told Hoover he was going to Mexico. Hoover said to

play it cool down there and to be back by Monday to be in court. Hoover was representing Spivey in another case set for that Monday.

Diamonds stolen from the Schepps' residence were later found in Hoover's home in a dresser drawer during the search previously discussed.

William J. Lyon, Jr. testified that he met Hoover in February of 1964 at Hoover's office in the Scanlan Building, Houston, Texas. Lyon's mother was thereafter employed by Hoover to manage certain apartments in San Antonio, Texas, where he and his mother were living. Lyon testified that he knew John Oscar Young, whom he identified in court at Hoover's trial. Lyon testified that on the day following the robbery, he saw Young sitting in the outer office of Hoover's suite of offices and that he saw Young go into Hoover's office. Spivey, of course, had testified that Hoover told Young to bring the stolen diamond to him. Hoover sent Lyon downstairs to buy a light bulb for a lamp in his office. When Lyon returned he saw Young leave the office. Hoover again sent Lyon downstairs to buy a newspaper. When he returned Hoover called him into his own office and asked him to lock the door behind him as he entered. Hoover said he wanted to show Lyon something and produced a very large man's diamond ring. Hoover said it was probably a hot ring and probably came from the Schepps' robbery. Hoover asked Lyon if he knew who Young was. When Lyon told him that he did not, Hoover told him that Young was a thief. He then showed Lyon a woman's brooch on a chain. Lyon described it as yellow gold with a flowery design, with diamonds or pearls on it.

According to Lyon, a few days later, Hoover came to the San Antonio apartments to talk with Lyon. Hoover knew that Lyon had by that time given a statement to the Houston Police Department. Hoover wanted to know what Lyon had told the police and when Lyon told him that he had related the events he had seen at Hoover's office, Hoover acted

rather annoyed. He said that he did not want Lyon to testify. Lyon's mother, who was present at this conversation, told Hoover that she had heard he was a pretty rough character and that he would just as soon rub somebody out as not. Hoover replied that "if you are out of the state you wouldn't have to be rubbed out, would you?" Lyon and his mother agreed to leave. Several days later, Lyon and his mother stopped at Hoover's office to pick up some money which Hoover offered them if they would leave. Hoover sat down at a typewriter in his office and typed out an affidavit for Lyon to sign contradicting what he had told the police. Lyon signed the statement. After Hoover gave his mother $150, they both left town. Mrs. Lyon took the witness stand and confirmed what her son had stated.

The District Court below ruled on the question of harmless error in a well-reasoned discussion as follows (306 F. Supp. at 993):

"In the recent case of Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (June 2, 1969), the United States Supreme Court applied the 'harmless error' doctrine of Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 in a state criminal trial involving incidental and cumulative confession hearsay that was otherwise the subject of limiting instructions by the trial court. The circumstances in *Harrington* were patently less compelling of this result than those that exist here. It was a joint criminal trial and therefore directly involved the doctrine announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, concerning the Confrontation Clause. There, as here, the evidence of record against the accused was manifest and even overwhelming—a circumstance which may be deemed persuasive although certainly not dispositive where a constitutional right is involved. 395 U.S. at 254, 89 S.Ct. 1726. In *Harrington,* as here, there were other confessions introduced with limiting instructions. In *Harrington* one of the codefendants actually testified and was subjected to cross-examination by the codefendant Harrington's trial counsel. Here, of course, the co-indictee, Samuel Spivey, testified as a state's witness at the separate trial and was subject to the most searching cross-examination desired by Petitioner's trial counsel. *Harrington* was followed in Neal v. United States, 9 Cir., 415 F.2d 599 (August 13, 1969) even though the other co-defendant-confessor in the joint trial declined to testify and was not cross-examined.

"The United States Court of Appeals for the Fifth Circuit in United States v. Cohen et al., 5 Cir., 418 F.2d 68 (October 30, 1969), treated the question of testimony that was technically hearsay but which was otherwise '* * * secondary and incidental to * * * admissible rebuttal evidence.' Viewing the technical hearsay as substantive evidence rather than as limited to impeachment purposes, and thus assuming error only *arguendo,* the Court of Appeals found the hearsay in question 'harmless' although there were no limiting instructions below and none requested and the case was on direct review. Indeed, without reaching a Confrontation Clause issue, the Court of Appeals for the Fifth Circuit has adopted the definition of technical hearsay as being '* * * a statement made by an unavailable declarant and offered for the truth of the matter in the statement.' Davis v. United States, 5 Cir., 411 F.2d 1126, 1127 (May, 1969), citing and quoting Brown v. United States, 5 Cir., 403 F.2d 489, 491. Under this traditional definition of technical hearsay, legally as well as rhetorically, the door would seem clearly open to curative instructions in an appropriate case. See also: Campbell v. United States, 6 Cir., 415 F.2d 356, for the proposition intimated in Bruton, 391 U.S. at 128, n. 3, 88 S.Ct. 1620, and now established in *Harrington,* that

technical hearsay will not necessarily present a Confrontation Clause issue."

The panel decision made short shrift of that holding. Inexplicably it said only (439 F.2d at 924):

"We cannot hold that either of the constitutional errors was harmless within the criteria of Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, and Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. In fact the appellee makes no such contention in this Court."

It is the District Court's opinion which is being reviewed by this Court. Thus we find it difficult to understand why the panel thought no greater attention was merited by the harmless error issue, than the few lines quoted above.[21]

The evidence of Hoover's guilt in a sordid and brutal crime is so manifest and overpowering, apart from the possible cumulative effect of the Sellars' confession implicating him, as to defy a contrary conclusion.[22] If the evidence was "tainted" by admission of the confession, though no right to cross-examine Sellars, the confessor, was permitted, then even more so was the conviction in *Harrington* "tainted" where two confessions implicating Harrington were admitted though no opportunity was afforded to cross-examine either declarant. But the Supreme Court upheld the conviction, Mr. Justice Douglas writing for the majority that "apart from them [the confessions] the case against Harrington was so overwhelming that we conclude that this violation of *Bruton* was harmless beyond a reasonable doubt

21. The State's reliance on the argument that there was no constitutional error in the trial rather than reliance on the "harmless error" doctrine cannot preclude this Court from making a "harmless error" holding, especially when the District Court below expressly relied also on that principle.

22. The violent and horrible details bear repetition. We quote from the opinion of the Texas Court of Criminal Appeals on Hoover's appeal to that court as follows (390 S.W.2d at 759–760):

"The evidence reveals that after Spivey, Young, and Sellars had been advised by the appellant that Schepps had $300,000 in money in his home, the appellant encouraged them among other things, to 'get you a car and equipment (guns) and get ready to go in,' and he also told them where to look for the money in the house. These three men, wearing masks, two of whom were armed with pistols and one with a sawed-off shotgun, went to the Schepps's home about 7 P.M., March 11, 1964. While they were preparing to enter the house, Mrs. Tuck, a nurse employed by Schepps, left the house to go to a nearby garage apartment and she was knocked unconscious by one of the masked men. Two of the robbers entered the main house and violently assaulted Mr. and Mrs.

Schepps and the third robber brought Mrs. Tuck into the house shortly thereafter.

"After numerous unsuccessful inquiries about the $300,000 the robbers' acts of violence and torture increased, to compel the Schepps to reveal the location of the money. Mrs. Schepps's jaw was broken, and some of her teeth were knocked out and others loosened; she was burned across the abdomen with a heated butcher knife; she was repeatedly burned on her face and body with cigarettes, and also repeatedly shocked with an electric wire placed to her teeth, breasts and private parts; a fireplace poker and a pistol were inserted into her vagina; and she was shot in the thigh with a .44 magnum pistol as she lay prostrate on the floor. Mr. Schepps was severely and brutally beaten and lay unconscious for short periods of time during the three-hour attack. The injuries of Mrs. Tuck were not so serious, but she required several days of hospitalization. The Schepps's ten-month old baby was threatened, and a shot was fired into the baby bed where the child lay. Most of the furniture and furnishings in the house, especially those on the second floor, were torn, broken, demolished, and scattered in an intense and violent search for the $300,000 reportedly hidden therein."

. . . ." 395 U.S. at 254, 89 S.Ct. at 1728.[23]

This Circuit has applied the "harmless error" principle where evidence of the defendant's guilt was exceptionally strong and it appeared that the error was harmless beyond a reasonable doubt on occasions too numerous to mention. A few recent examples particularly related to matters of evidence include Martin v. United States, 5 Cir., 1972, 453 F.2d 1370 (errors asserted under *Bruton*, supra, "if errors at all, are harmless beyond a reasonable doubt." Id. at 1370); United States v. Herrera, 5 Cir., 1972, 455 F.2d 157 ("In any event, assuming that this testimony is hearsay, the introduction of it was harmless. We are convinced that the judgment of the jury was not influenced by it because the Government's case was convincing independent of the hearsay." Id. at 158); United States v. Williamson, 5 Cir., 1971, 450 F.2d 585 ("The question is not merely whether a mistake was made in applying the technical and sometimes arcane rules of evidence but whether that mistake resulted in prejudicial error clearly affecting the substantial rights of the accused." Id. at 591); United States v.

Roland, 5 Cir., 1971, 449 F.2d 1281 ("Considering the evidence as a whole, we are 'sure that the error did not influence the jury.' Kotteakos v. United States, 1946, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557." Id. at 1282); United States v. Frost, 5 Cir., 1970, 434 F.2d 607 ("The hearsay evidence admitted at appellants trial did not create substantial prejudice because the government's case was equally strong without the hearsay . . . ." Id. at 608); Posey v. United States, 5 Cir., 1969, 416 F.2d 545 (evidence contained in a confession admitted in violation of *Bruton* "was merely cumulative and, apart from it, the case against the co-defendants was so overwhelming that we conclude that any possible violation of *Bruton* was harmless beyond a reasonable doubt." Id. at 551.) The rule is the same in other Circuits. See, e. g., United States ex rel. Long v. Pate, 7 Cir., 1969, 418 F.2d 1028, 1030–1031, cert. denied, 398 U.S. 952, 90 S.Ct. 1877, 26 L.Ed.2d 294 (1970); United States v. Young, 8 Cir., 1970, 422 F.2d 302, 308. See also J. Cameron and J. Osborn, When Harmless Error Isn't Harmless, 1971 Law and the Social Order 23, 32 (1971). The panel's

---

23. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), is similar to this case in certain material regards:

". . . Four men were tried together—Harrington, a Caucasian, and Bosby, Rhone, and Cooper, Negroes—over an objection by Harrington that his trial should be severed. Each of his three codefendants confessed and their confessions were introduced at the trial with limiting instructions that the jury was to consider each confession only against the confessor. Rhone took the stand and Harrington's counsel cross-examined him. The other two did not take the stand." Id. at 252, 89 S.Ct. at 1727.

\* \* \* \* \*

". . . Rhone's confession, however, placed Harrington inside the store with a gun at the time of the attempted robbery and murder.

"Cooper's confession did not refer to Harrington by name. He referred to the fourth man as 'the white boy' or 'this white guy.' And he described him by age, height, and weight.

"Bosby's confession likewise did not mention Harrington by name but referred to him as a blond-headed fellow or 'the white guy' or 'the Patty.'" Id. at 253, 89 S.Ct. at 1728.

The Court assumed that the references to "the white guy" clearly referred to petitioner. Nevertheless, the Court found the error to be harmless:

"Rhone, whom Harrington's counsel cross-examined, placed him in the store with a gun at the time of the murder. Harrington himself agreed he was there. Others testified he had a gun and was an active participant. Cooper and Bosby did not put a gun in his hands when he denied it. They did place him at the scene of the crime. But others, including Harrington himself, did the same. Their evidence, supplied through their confessions, was of course cumulative. But apart from them the case against Harrington was so overwhelming that we conclude that this violation of *Bruton* was harmless beyond a reasonable doubt . . . ." Id. at 253–254, 89 S.Ct. at 1728.

cryptic rejection of the "harmless error" rule to the circumstances here was patently erroneous and cannot be allowed to stand.

## III.

The dissent filed herein is merely a lengthy restatement of the views of the panel in the original decision in this case. We are impelled, however, to make further elaboration of the majority opinion because of what we consider to be erroneous statements of law and fact in the dissent.

The dissent questions our holding that the principles of Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), do not apply retroactively to the search and seizure in question which occurred at Hoover's home. It is contended that Aguilar announced no "new" doctrine and accordingly that Hoover need not rely on Aguilar retroactively; also that the Supreme Court in Riggan v. Virginia, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431 (1966), has determined the Aguilar retroactivity issue adversely to our position. In our view, the dissent's reasoning is erroneous. Though the holding in Aguilar is supported by prior decisions in Nathanson [24] and Giordenello [25] which were federal cases, the Aguilar pronouncement was

made for the first time in a state case.[26] The crux of the dissent's contention is that for a decision to be "new" it cannot have a foundation in precedent, a proposition which falls of its own weight. As we have pointed out, the recent case of Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), is directly applicable and in that case the Supreme Court held that where a decision narrowed the scope of permissible searches it was not to be retroactively applied to searches which occurred prior to the date of the decision. In Riggan, the issue of Aguilar's retroactivity was not presented to the Court (see 34 L.W. 3273) and was not decided by the Court. See 384 U.S. at 152, 153, 86 S.Ct. at 1378, 1379. Williams was decided much later than Riggan.

As to the alternative question of Hoover having voluntarily consented to the search and, in fact, having invited it, the dissent insists that Bumper v. State of North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), to which we have already referred, is expressed in absolute terms and consent to search is legally impossible where an invalid search warrant is presented. Curiously, in making this assertion the dissent appears to abandon that part of the original panel decision which asserted that

---

24. Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), held that mere affirmance of belief or suspicion by the affiant is not enough to secure a warrant to search. However, Aguilar's requirement that the affiant further explicate the nature of "reliable information from a credible person," while supported by the holding in Nathanson, is clearly an extension of that holding.

25. In Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the Court voided a search incident to an arrest conducted pursuant to an invalid warrant. The arrest warrant was found invalid because the affiant had recited no facts on which his conclusions that Giordenello had committed a crime and concealed evidence were based:

"The complaint contains no affirmative allegation that the affiant spoke with

personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made." 357 U.S. at 486, 78 S.Ct. at 1250.

26. The dissenting opinion in Aguilar, supra, 378 U.S. at 116–122, 84 S.Ct. at 1515–1518, references numerous decisions upholding affidavits similar to that held invalid in Aguilar. Indeed, not until the decision in Aguilar did the Supreme Court explicitly hold that "The principles announced in Giordenello derived, therefore, from the Fourth Amendment, and not from our supervisory power." 378 U.S. at 112, n. 3, 84 S.Ct. at 1513, n. 3. Cf. 378 U.S. at 118, 84 S.Ct. at 1516 (dissenting opinion). See also Spinelli v. United States, 393 U.S. 410, 412, 89 S.Ct. 584, 587, 21 L.Ed.2d 637 (1969).

"while it is possible to give valid consent to search even after the existence of the warrant is made known, the State must show by clear and convincing evidence that the consent is not based upon the warrant and was not coerced by any other factors" and further stated, "It is conceivable that a person could give a voluntary and uncoerced consent to search even though he had been informed that the officers had a search warrant. But the State would bear the burden of showing that the consent was given sufficiently independent of the warrant to remove the taint of its coercive nature." 439 F.2d at 920. In our opinion the panel's holding in this regard, rather than the present dissent, correctly states the law. Resolution of the question of consent and invitation to search under such circumstances is dependent upon the facts of each case. *Bumper* was decided on its facts which are substantially dissimilar to those facts of this case, as we have already pointed out. Yet the dissent argues that "Nowhere does *Bumper* draw a distinction, as the majority in this case seemingly does, between an invitation and acquiescence." The answer to this argument is plain—*Bumper* did not involve an invitation, such as occurred here.

■ The dissent insists that under no circumstances should Sellars' confession have been admitted in evidence since "Sellars was available to testify" and the State is charged with failure to call Sellars to the stand and there elicit his confession.[27] It is completely unrealistic to say that Sellars was available to testify in the present case and that the State District Attorney should have called him to the stand to prove his confession. The State was soon to try him for a capital offense in which the death penalty was sought and later obtained. It would have been grossly improper for the District Attorney to have called Sellars to the witness stand under these circumstances and would have been vain and fruitless, possibly demanding disciplinary action against the prosecutor. Whatever opportunity the State might have to obtain a conviction against Sellars would have been seriously imperiled by the prejudice to Sellars and the attempted violation of his Fifth Amendment privilege. It cannot be fairly said under the circumstances that Sellars was available and should have been called by the State as a witness.

As we have already pointed out in this opinion the State District Judge held a full hearing during the trial, out of the presence of the jury, as to the voluntariness of Sellars' oral confession and found that the facts were undisputed that it was freely given. (See footnote 14, supra.) No issue on this finding has been made so far as we can find. Voluntariness, as we have previously noted, is the foremost indicia of reliability. References to the accomplice in the confession were permitted where so intertwined with the confession itself as to render it incomplete or unintelligible. The late decisions of the Supreme Court, California v. Green, supra, and Dutton v. Evans, supra, are sufficient answer to the contentions of the dissenting opinion in this regard.

The dissent's assertion that the majority opinion does not consider the issue of harmless error with respect to the question whether the principals (Young, Sellars and Spivey) named in the indictment committed the Schepps' robbery is incredible under the circumstances. Young's written confession is in evidence, Sellars' oral confession (through Officer

---

27. The dissent erroneously concludes that the case of Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, supports the view that admission of Sellars' confession has violated the confrontation clause, even if admitted solely to prove that Sellars committed the adjunct crime because Sellars was presumably available to testify. Moreover, the dissent erroneously states that the Texas court has concluded that "in no event can a confession be admitted in which direct references are made to the alleged accomplice." A close examination of the four opinions filed by the five judges in the *Schepps* case, in light of the latest case of Chapman v. State, Tex.Cr.App.1971, 470 S.W.2d 656, indicates a contrary result. See also footnote 10, supra.

Stone) is in evidence, and Spivey's testimony at the trial admitting that he committed the robbery, are all in evidence. Spivey also implicated Young and Sellars as his co-participants in the robbery and Hoover as his accomplice. There was abundant additional evidence from police officers, the victims, and physical evidence such as tape, guns, knife, clothing (with bloodstains) directly connecting the principals with the robbery. The evidence in this respect is so voluminous that a full recital thereof would unduly lengthen this opinion. For example, Sellars took police officers to the yard at his residence where items of jewelry stolen from the Schepps' residence were buried. The items were dug up and recovered by the police and introduced into evidence through the supporting testimony of the officers. Hair identified as Sellars' was found at the scene of the robbery in the Schepps' residence. Clothing of Sellars, identified as such, and tape were found in a garbage can near Sellars' residence.[28] Obviously there is no merit to this portion of the dissent.

As we read the dissenting opinion on the issue of harmless error, much of it is taken up with an attack on the credibility of the principal State witness Spivey whose "veracity is inherently suspect" and the corroborating witness Lyon who "was nineteen years of age and had been convicted of breaking and entering" and whose testimony is said to be "incredible" in that he was willing to leave the State with his mother and three brothers to avoid testifying "for the paltry sum of $150." The State Trial Judge made it quite clear that the jury would have to pass on the credibility of witnesses. As to Spivey, the Trial Judge said to the jury "you are instructed that you cannot find the defendant (Hoover) guilty upon his (Spivey's) testimony unless you first believe that the testimony of the said Samuel Spivey is true and that it shows the defendant is guilty as charged in the indictment; . . . ." It was for the jury to resolve the credibility of witnesses. See LaBlanc v. Patterson, D.C.Colo., 1968, 294 F.Supp. 607, 609 ("nor may the credibility of the victim as a witness be attacked in Federal Habeas Corpus proceedings"). See also Pleas v. Wainwright, 5 Cir., 1971, 441 F.2d 56, 57; Fulford v. Dutton, 5 Cir. 1967, 380 F.2d 16, 17. There can be no question in this case that the jury believed the State's witnesses, including Spivey, or it would not have found Hoover guilty. We are mindful of what the Supreme Court said in the recent case of Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972), "Judicious application of the harmless error rule does not require that we indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares us in the face."

Spivey's testimony was amply corroborated by direct evidence as we have indicated and as we have shown by reference to the opinion of the Texas Court of Criminal Appeals when it decided Hoover's appeal. There were other corroborating witnesses besides Lyon. Lyon's mother testified that she was present at the time Hoover made his arrangements and caused the Lyon family to leave the State rather than remain

---

28. Some of the corroborating physical evidence is recited in the text of the opinion in Hoover v. State, Tex.Cr.App.1965, 390 S.W.2d 758, 760, as follows:

"A pair of slacks, a black shirt, a hat, a pair of gloves, and rolls of adhesive tape were found in a garbage can near the home of Calvin Sellars. Fibers taken from the articles were shown to be identical with those removed from the carpet in the Schepps home, and an examination of traces of human blood on some of the articles revealed the blood to be the same type as Mr. Schepps's. Also a human hair taken from the shirt was shown to be identical to one removed from Sellars. Furthermore, the officers recognized the trousers found in the can as the same ones Sellars was wearing at the time of a previous arrest.

"Upon a search of appellant's house following the arrest of the three robbers, the officers found therein two diamonds, one weighing 4.83 carats and the other 2.70 carats."

and give evidence against the defendant. There was additional corroboration from the victims, Schepps, Mrs. Schepps and Mrs. Tuck, directly corroborating parts of Spivey's testimony.

In addition to all of this, we have not heretofore commented on testimony of State's witness Elmer Jack Boney. When Boney testified in this case he was under a 20-year sentence in the Texas State Prison for robbery. At the trial he said that he met Hoover at his office where Hoover told him that "he had this score lined up that I would be interested in." Boney said that Hoover gave him the name and address of Mair Schepps at 9704 Memorial and told him to look the place over, that it was a "sizeable score", that there were several hundred thousand dollars and some furs and jewelry in the house. Hoover told him to look in the deep freeze and the bedrooms and that he would probably have to use force on Mr. Schepps. Boney testified that while he did pass the house and observe it, he did not participate in the robbery because he was arrested by the police in connection with another robbery for which he is now incarcerated. Hoover also told Boney that if force did not work on Mr. Schepps, to start on Mrs. Schepps with a possibility that Mr. Schepps would give in on the information.

This additional corroboration conclusively establishes beyond reasonable doubt the tremendous volume of incriminating evidence which the record discloses against petitioner Hoover.

In deciding this case we are aware of the principle announced by Chief Justice Burger in the current decision of the Supreme Court in Milton v. Wainwright, decided June 22, 1972, and appealed from this Circuit, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1, that "The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases de novo but rather to review for violation of federal constitutional standards. In that process we do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court . . . ." Mr. Justice Cardozo's remarks in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, cited with approval in Dutton v. Evans, supra (400 U.S. at 89–90, 91 S.Ct. at 220), are appropriate here:

> " 'There is danger that the criminal law will be brought into contempt— that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.' 291 U.S., at 122, 54 S.Ct., at 338."

The panel decision is reversed; the judgment of the District Court is affirmed.

RIVES, Circuit Judge, dissenting, with whom WISDOM, THORNBERRY, GOLDBERG, GODBOLD and SIMPSON, Circuit Judges, join, and with whom GEWIN, Circuit Judge, joins in Part II and a portion of Part III of the opinion:

Hoover appeals from the denial of his habeas petition challenging the validity of his conviction in a Texas state court of the offense of being an accomplice to the commission of robbery. The state court sentenced him to imprisonment for a term of sixty years. Hoover's habeas petition is based upon two separate federal constitutional grounds: (1) his right to be secure in his home from unreasonable search and seizure; and (2) his right to be confronted with the witnesses against him.

Upon original hearing of this appeal the members of the panel (Rives and Simpson, Circuit Judges, and Nichols, Judge of the Court of Claims sitting by designation) were unanimous in their decision of both issues in favor of Hoover. See Hoover v. Beto, 5 Cir. 1971, 439 F.2d 913 (hereinafter cited as "panel opinion"). Upon rehearing en banc a majority of the en banc court is now deciding both issues against

Hoover. I adhere to our original decision and respectfully, but strongly, dissent.

To justify affirmance of the district court, the original panel must have been wrong and the majority of the en banc court must be right as to the decision of *both* issues.

While the facts as to Hoover's guilt or innocence have always been and remain in dispute, at this point it is not necessary to discuss the evidence to decide this appeal.[1] That much of the evidence was briefly summarized in the opinion of the Texas Court of Criminal Appeals, Hoover v. Texas, 1965, 390 S.W.2d 758, and has been retold at least thrice: (1) by the district court in denying habeas corpus, Hoover v. Beto, S.D.Tex.1969, 306 F. Supp. 980; (2) by the original panel on this appeal, 439 F.2d 913; and (3) by the majority in its opinion on en banc rehearing.[2] Hence, without further ado, I proceed to a discussion of the two separate issues.

### I. *The Search and Seizure Issue*

#### A. *Validity of the Search Warrant*

The panel held that the search of Hoover's home was not authorized by a *valid* search warrant. 439 F.2d at 916–917. On en banc rehearing, the majority expresses a different view:

> "[W]e hold that the search of Hoover's home was not constitutionally invalid because of Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The State of Texas con-

cedes that if *Aguilar* applies to the search of Hoover's home, the affidavit supporting the search warrant does not meet the probable cause standards prescribed by *Aguilar*. The State argues, however, that *Aguilar* does not apply to the search in question which occurred about three months before *Aguilar* was decided on June 15, 1964. The original panel held that 'Hoover need not rely on *Aguilar* retroactively since he had not been tried and convicted when the decision of *Aguilar* was rendered.' 439 F.2d at 917 [*quoting from* Doby v. Beto, 5 Cir. 1967, 371 F.2d 111, 113]. Subsequent to the panel decision, however, the Supreme Court decided Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), which held that *a prior [sic] decision which narrows the scope of permissible searches* is not to be retroactively applied to searches conducted prior to the date of decision. Thus, because the Hoover search was made prior to the Supreme Court's decision in *Aguilar*, it is not affected thereby. The panel's holding that the search of Hoover's home was constitutionally invalid is expressly rejected by us."

Majority opinion at 522 (emphasis supplied).[3]

In the light of the Supreme Court's holding in *Williams, supra,* relied on by the majority, it must now by hindsight be conceded that the panel's reliance on Doby v. Beto, 5 Cir. 1967, 371 F.2d 111,

---

[1]. The majority and I are in disagreement as to some of the facts and reasonable inferences established by constitutionally admissible evidence. Such evidence and inferences can more conveniently be discussed in later parts of this opinion.

[2]. In connection with the majority's statement, on page 518 of its opinion, that "Sam Hoover is presently serving a sixty-year sentence imposed by the Criminal District Court of Harris County, Texas," I express some doubt because Hoover is also under an eight-year sentence imposed by the United States District Court for the Southern District of

Texas for making false income tax returns. See Hoover v. United States, 5 Cir. 1966, 358 F.2d 87, cert. denied, October 1, 1966, 385 U.S. 822, 87 S.Ct. 50, 17 L.Ed.2d 59. I do not know what sentence Hoover is presently serving, but I do not believe the question is material to this appeal.

[3]. I submit that the fallacy in the majority's reasoning becomes self-evident when it is recognized, as will presently be demonstrated, that *Aguilar* is not a "decision which narrows the scope of permissible searches."

113,[4] was a mistake. The majority, however, ignores the fact that *Doby* was not the sole basis for the panel's holding that *Aguilar* applies to the search of Hoover's house. In addition to "mistakenly" relying on *Doby*, the panel said:

"Hoover's counsel make a strong argument that *Aguilar* announced no new doctrine, but, as disclosed in the opinion, 378 U.S. at 110–113, 84 S.Ct. 1509, did no more than apply the principles decided in Nathanson v. United States, 1933, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159; Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; and Ker v. California, 1963, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. In Riggan v. Virginia, 1966, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431, the Court, upon granting certiorari, summarily reversed saying simply, 'The judgment is reversed. Aguilar v. Texas, 378 U.S. 108 [84 S.Ct. 1509, 12 L.Ed.2d 723],' thus applying *Aguilar* to a search conducted by Virginia officers on January 22, 1963 (see 206 Va. 499, 144 S. E.2d 298), long prior to the decision in *Aguilar*."

439 F.2d at 917.

Of course, we are all bound now to agree that a choice of giving retrospective or prospective effect to a judicial decision arises only from a frank recognition "that judges exercise a law creating function, although, of course, subject to the limitation of unreasonable 'judicial legislation.'" United States ex rel. Linkletter v. Walker, 5 Cir. 1963, 323 F.2d 11, 14. See also *id.* at 20 (Tuttle, J. dissenting). The Supreme Court's opinion affirming this Circuit more clearly outlines the history and theory of the problem. Linkletter v. Walker, 1965, 381 U.S. 618, 622, et seq., 85 S.Ct. 1731, 14 L.Ed.2d 601 Mr. Justice White's opinion in Williams v. United States, 1971, 401 U.S. 646, 659, 91 S.Ct. 1148, 1156, 28 L.Ed.2d 388, recognizes the "confusing problems of identifying those 'new' constitutional interpretations that so change the law that prospectivity is arguably the proper course."

*Aguilar* announced no "new" doctrine. That fact is demonstrated beyond cavil both by the opinion in *Aguilar* itself and by the opinion of the Supreme Court in Riggan v. Virginia, 1966, 384 U.S. 152, 86 S.Ct. 1378, 16 L.Ed.2d 431.

The affidavit at issue in *Aguilar* is remarkably similar to the affidavit supporting the warrant to search Hoover's home.[5] Thus, the Supreme Court's condemnation of the affidavit in *Aguilar* applies with equal force in this case. 378 U.S. at 110–113, 84 S.Ct. 1509. Notably the Court based its reasoning wholly upon prior case law. *E. g.,* Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Nathanson v. United States, 1933, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159. There was no

---

4. From which the panel had quoted:
 "'It is not necessary that appellant rely on the *Aguilar* decision retroactively since his conviction was not final when the decision in *Aguilar* was rendered.'"
 439 F.2d at 917.

5. The affidavit in *Aguilar* read in relevant part:
 "'Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.'" 378 U.S. at 109, 84 S.Ct. at 1511.

The affidavit at issue in this case read in part:
 "My belief as aforesaid is based on the following facts: Information from a reliable source that the above described property is now being concealed at the above address." 439 F.2d at 925.
 Digressing slightly it should also be noted that in this case the quoted language in the affidavit was not carried forward in the search warrant, the only document handed to Hoover. To the contrary, that warrant stated positively that the affidavit alleged "that said property is now concealed by Sam Hoover in his home located at * * *." 439 F.2d at 925.

implication that a new rule was in the making or that the scope of permissible searches was being narrowed. To demonstrate the constitutional insufficiency of the affidavit in this case, Hoover need not rely on *Aguilar,* but could safely rely on the earlier decisions discussed in *Aguilar* at 378 U.S. 110–113, 84 S.Ct. 1509. Thus, it is literally true that "Hoover need not rely on *Aguilar* retroactively." 439 F.2d at 917.

Next, in *Riggan* (cited in the panel opinion, 439 F.2d at 917) the Supreme Court applied *Aguilar* (decided June 15, 1964) to a search conducted on January 22, 1963. Its fully retrospective application of *Aguilar* could not have been based on any partial retroactivity concept, such as that discussed in *Williams,* but was a holding of absolute and unqualified retroactivity which could be justified only by the Supreme Court's view that it had announced no "new" or novel doctrine. The four dissenting Justices in *Riggan* indicated complete agreement with the majority on that score:

> "[The affidavit in *Aguilar*] was found inadequate under the rule applied in Giordenello v. United States, 357 U.S. 480 [, 78 S.Ct. 1245, 2 L.Ed.2d 1503] (1958), where a majority of the Court found that the complaint 'does not indicate any sources for the com-

plainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made.' At 486 [, 78 S.Ct. at 1250]."

384 U.S. at 153, 86 S.Ct. at 1379.

When the majority judges in the present case hold that, "Thus, because the Hoover search was made prior to the Supreme Court's decision in *Aguilar,* it is not affected thereby" (majority opinion at 522), they undertake to overrule the Supreme Court's pronouncement in *Riggan.* That cannot be. I respectfully, but earnestly, submit that there is no room for legitimate argument: The search of Hoover's home is not justified by the existence of a *valid* search warrant.

**B. Consent**

Having concluded that the search warrant was invalid, I now turn to the majority's view that Hoover consented to the search. I reject that theory on two grounds.[6] First, one cannot consent to a search in the face of a seemingly legal search warrant.[7] Second, even assuming arguendo that a consent can be given, the facts in this case do not support such a finding.

(1) Bumper v. North Carolina, 1968, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, is squarely in point.[8] And the ma-

---

**6.** My rationale is the same expressed in the decision of the original panel:

"'A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid.' [Quoting from Bumper v. North Carolina, 1968, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797.] The officer's return on the back of the search warrant is record evidence that the search was conducted in reliance on the warrant. Conceding arguendo, however, that the search can be justified on the basis of consent, we cannot agree that Hoover voluntarily consented to the search."
439 F.2d at 920.

**7.** As the court in Naples v. Maxwell, S.D. Ohio 1967, 271 F.Supp. 850, 856, said:
"Where a search, as in this case, has been instituted under the authority of a

search warrant, the question of consent cannot arise in the absence of a plain and clear showing that the individual being subjected to the search has refused to recognize that the search warrant is valid and binding. Stated otherwise, unless an accused, after being served with a search warrant, unequivocally states that he believes that the search warrant is unlawful and illegal, he cannot consent to the subsequent search."
*Naples* was cited with approval by the Supreme Court in Bumper v. North Carolina, *supra.*

**8.** The majority does not contest *Bumper's* retroactivity. Nonetheless some comment is in order. *Bumper* announced no new or novel rule; the Court cited a number of cases as direct authority for its holding. At least one court has explicitly

jority's attempt at narrowing the holding in *Bumper* is factitious. In that case four officers came to the house of a 66 year-old Negro woman, Mrs. Leath. After the police stated that they had a search warrant she replied, "Go ahead." Mrs. Leath never asked for or saw the warrant. She testified at the suppression hearing that she told the police "to come on in and go ahead and search," that she "had no objection to them making a search," that she "was willing to let them look in any room or drawer," and that she had allowed them to search of her "own free will." 391 U.S. at 547 and n. 8, 88 S.Ct. at 1791.

The Court in *Bumper* framed the issue precisely:

> "The issue thus presented is whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant."

Id. at 548, 88 S.Ct. at 1791 (footnote omitted). Equally precise was the Court's holding: *"We hold that there can be no consent under such circumstances." Id.* (emphasis supplied). Similarly: *"A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid."*

*Id.* at 549, 88 S.Ct. at 1792 (emphasis supplied) (footnote omitted). And:

> *"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."*

*Id.* at 550, 88 S.Ct. at 1792 (emphasis supplied). The Court did not say that under the peculiar circumstances of that case there was no consent. Rather its holding was expressed in absolute terms. Indeed, Justice Black, in dissent, complained that Mrs. Leath clearly had consented to the search. If a consent were legally possible, I might agree with Justice Black. But the majority of the Court held, in effect, that no matter what words Mrs. Leath used her consent was ineffectual.[9] The wisdom of that holding is strikingly demonstrated by the facts of Hoover's case. See footnote 13, p. 547, *infra.*

(2) The majority of this en banc court reasons that Hoover validly consented to the search because, "There is no affirmative evidence in the record to support the contention that the invitation was actually involuntary." Majority opinion at 520. Such reasoning misses the mark.

---

recognized the significance of *Bumper's* reliance on prior case law. See United States v. Retolaza, 4 Cir. 1968, 398 F.2d 235 ("Bumper, as the citations contained therein demonstrate, announced no new or novel constitutional rule * * *."); see also Williams v. United States, 1971, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (announcing the standard of retroactivity). Moreover, in Overton v. New York, 1968, 393 U.S. 85, 89 S.Ct. 252, 21 L.Ed.2d 218 the Supreme Court remanded a case involving a pre-*Bumper* search for reconsideration in light of *Bumper.* The district court in this case erred in concluding that *Bumper* is not retroactive. See Hoover v. Beto, S.D. Tex.1969, 306 F.Supp. 980, 989.

**9.** The Court in *Bumper* quoted at length from Meno v. State, 197 Ind. 16, 24, 164 N.E. 93, 96, in support of its holding:

> " 'One who, upon the command of an officer authorized to enter and search and seize by search warrant, opens the door to the officer and acquiesces in obedience to such a request, *no matter by what language used in such acquiescence,* is but showing a regard for the supremacy for the law. * * * The presentation of a search warrant to those in charge at the place to be searched, by one authorized to serve it, is tinged with coercion, and submission thereto cannot be considered an invitation that would waive the constitutional right against unreasonable searches and seizures, but rather is to be considered a submission to the law.' "

391 U.S. at 549 n. 14, 88 S.Ct. at 1792 (emphasis mine) (omission by the Court).

First, as *Bumper* made abundantly clear, the burden is upon the State to prove that a valid consent was given.[10] The majority would shift this burden to Hoover. Second, the Court in *Bumper* noted that the "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." 391 U.S. at 548–549, 88 S.Ct. at 1792 (footnote omitted). Nowhere does *Bumper* draw a distinction, as the majority in this case seemingly does, between an invitation and acquiescence. To the contrary, the Court in *Bumper* cited United States v. Elliott, D.Mass. 1962, 210 F.Supp. 357, in support of its view. In *Elliott* the defendant said, after being confronted with a search warrant, "You don't need any warrant," and led the police into his bedroom. *Id.* at 359.[11]

Thus, even assuming that one can consent to a search conducted upon an invalid warrant, Hoover's alleged statements to Officer Hodges certainly constituted no more of an invitation or acquiescence to search than did Mrs. Leath's remarks in *Bumper*, or the defendant's in *Elliott*. It is axiomatic that to waive a constitutional right, one must first be aware of the right. Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. The majority suggests that because Hoover was an experienced trial lawyer he knew of his rights. As a lawyer he did know that a policeman bearing a search warrant has a right, a duty, to enter the premises and perform his task. Indeed Officer Hodges testified that, no matter what Hoover said, the search would have been conducted. Hoover had no conceivable way of knowing the warrant was invalid. There is no evidence that the faulty affidavit was submitted to his perusal. Without knowledge of the warrant's invalidity, or any reasonable basis to assume such, Hoover's legal training commanded his acquiescence.[12] Consequently, there was no consent. Even assuming *arguendo* that one may consent to a search conducted under an invalid warrant, the district court's contrary finding in this case (that Hoover consented) is clearly erroneous.[13]

In sum, the search warrant at issue was invalid in light of *Aguilar, supra,* and its precedents. And since there was not a valid consent to the search, the evidence seized should have been suppressed. Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

## II. *Confrontation*

The majority and I are in complete disharmony with respect to Hoover's right of confrontation. The majority first reasons that there has been no abridgment of Hoover's substantive right of confrontation guaranteed under the Sixth Amendment, made applicable to the States by the Fourteenth Amendment,

10. Said the Court: "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." 391 U.S. at 548, 88 S.Ct. at 1792.

11. Similarly, the Eighth Circuit Court of Appeals, in McCreary v. Sigler, 1969, 406 F.2d 1264, found no consent where the accused had said, having been shown a warrant, "You don't need it. Go ahead and search." *Id.* at 1267.

12. See the final paragraph of note 5, *supra.*

13. Hoover's case vividly illustrates the injudicious aspect of turning the existence of a consent to a search had upon an illegal warrant on the words chosen by the person to be searched. When Officer Hodges and the eight other officers arrived at Hoover's door, they were relying on the warrant. (Their reliance is evidenced by the return ultimately made on the warrant.) It is doubtful that much attention was paid to the precise words of acquiescence chosen by Hoover. Only after some months had elapsed was Hodges called upon to relate what Hoover had said. Curiously, Hodges' account corresponded exactly with the language of Stanford v. State, 1942, 145 Tex.Cr.R. 306, 167 S.W.2d 517, 519, a case in which the Texas court validated a consent given to a search conducted pursuant to an allegedly illegal warrant.

and then concludes with the catch-all that, even if Hoover's right of confrontation was violated, the error was harmless beyond a reasonable doubt. I do not agree with either rationale. Indeed restudy has left me all the more firmly convinced that the decision of the original panel is sound.

## A. *Posture*

For clarity, I again state the three elements to the crime of accomplice under Texas law. The State must prove the existence of each beyond a reasonable doubt: (1) That the principals committed the adjunct crime; (2) that, before the commission of the crime, the accused accomplice advised or encouraged the principals in their endeavors; and (3) that the accused was not present during the actual perpetration of the crime.[14]

To facilitate proof of the first element Texas fashioned an exception to the hearsay rule, which permits the State to introduce out-of-court confessions or admissions of a principal at the trial of the accomplice. See IV Wigmore § 1079 (3d ed.). As I noted in penning the opinion for the original panel (439 F.2d at 922):

"[T]he cases which allowed the confession of the principal to be used at the trial of the accomplice

"'* * * go no further than to give effect to the general rule that the admissions or confessions of the principal (if they would be admissible if the principal were on trial) are admissible on the trial of the accomplice, not for the purpose of proving the guilt of the accomplice, but for the purpose solely of proving the guilt of the principal. [Citing authorities.]

"'Statements in the confession of the principal which relate solely to the guilt of the accomplice, and which throw no light on the principal's actions, should be excluded. [Citing authorities.] However, if the expressions connecting the accomplice with the offense, when eliminated, render the confession incomplete and fragmentary, they may be received in evidence. In that event, the trial court should carefully guard the rights of the accomplice on trial by limiting the purpose of the confession to establishing the principal's guilt.'

[Browney v. State, 1934, 128 Tex.Cr.R. 81], 79 S.W.2d [311] at 314." [15]

At Hoover's trial in state court, the trial judge, in reliance upon the stated rule, permitted the prosecution to introduce the oral confession of Calvin Sellars, one of the principals, through the mouth of Officer C. V. Stone. While Stone was on the stand, and at all other relevant times, Sellars was available to testify. The State could have called him

---

14. See note 1 and accompanying text to panel opinion, 439 F.2d at 915.

15. As noted in the panel opinion, 439 F.2d at 922:

"By peculiar coincidence, the rule is discussed at length in a * * * case in which Mair Schepps, the victim of this robbery, was charged with being an accomplice to the commission of a different offense. Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, 927, 938–943."

The majority, at opinion pp. 524–525, makes reference to the original decision in *Schepps* but fails to note the opinion concurred in by two of the five justices on the Texas high court in answer to the State's motion for rehearing. 432 S.W.2d at 938, et seq. Therein the court held that in consonance with certain de-

cisions of the United States Supreme Court (discussed *infra*) the Texas rule is no longer constitutionally applicable when the declarant whose confession is sought to be introduced is himself available to testify. That is, the declarant must take the stand. Moreover, three justices agreed that in no event can a confession be admitted in which direct references are made to the alleged accomplice. For, in light of Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, it may no longer be assumed that the jury will heed a limiting instruction to disregard such references. Notably, *Bruton* was given retroactive effect in Roberts v. Russell, 1968, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100.

For fuller discussion of *Schepps* see *infra*, note 29.

to the stand and sought to elicit the confession.[16] Rather than following that course, the prosecution asked Stone to relate Sellars' confession. Importantly, Sellars' statements contained direct references to Hoover which clearly indicated that Hoover had been an accomplice to the Schepps' robbery. Defense counsel opposed introduction of the confession in its entirety. The state court overruled that motion. In the alternative, defense counsel sought to have the references directly implicating Hoover deleted prior to Stone's testimony. The judge refused on the premise that to do so would render the remainder of the confession so fragmentary as to be unintelligible.

Stone testified at great length as to Sellars' account of the robbery. However, Stone did not relate the confession in one, uninterrupted statement. Rather each and every fact was elicited by pointed, detailed questions from the prosecuting attorney, as is demonstrated in Appendix A to this opinion. Appendix A is Record proof that the panel was correct when it stated: "The sole purpose of most or all of the references to Hoover * * * could only have been to implicate Hoover." 439 F.2d at 923.

To me it seems obvious that the omission of the references to Hoover so painstakingly extracted from Stone would not have rendered Sellars' confession unintelligible. Perforce, then, assuming the Texas rule is constitutional, it was not complied with in this case. See panel opinion, 439 F.2d at 922, 923.

Even under Texas law Sellars' confession was not admissible to implicate Hoover but only to prove that the principals had committed the robbery. The references to Hoover could have been de-

---

16. It may be that Sellars would have refused to testify, asserting his fifth amendment privilege against self-incrimination (at the time of Hoovers' trial, Sellars had not yet been tried); or it may be that Sellars would have recanted his confession. But there is no evidence that either of these possibilities would actually have ensued if the prosecution had called him to the stand.

After having received my dissenting opinion the majority has seen fit to abandon its original rationale and make the spurious assertion that Sellars was unavailable to testify. The State of Texas never posed that argument and until this time neither has the majority. The majority now contends that since Sellars "would" have taken the Fifth Amendment, the prosecution was justified not only in omitting to call Sellars as a witness but also in permitting Officer Stone to testify as to Sellars' confession. It is not our role as appellate judges to conclude as an absolute fact that Sellars would have pleaded the Fifth Amendment. Indeed he might simply have recanted (or perhaps even affirmed) his earlier confession. But if the prosecution feared that Sellars would have refused to testify, the short answer would have been to try Sellars first. After all appeals were exhausted, the Fifth Amendment would no longer be available.

Yet even assuming Sellars would have asserted the privilege, it does not follow that the prosecution could introduce the confession by way of Stone. To the contrary, in Douglas v. Alabama, 1965, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934, the Supreme Court held that if one in Sellars' shoes pleads the Fifth Amendment the prosecution *cannot* introduce the confession by other means. In my mind, the facts in *Douglas* are indistinguishable from the majority's view that Sellars "would" have taken the Fifth Amendment. When a witness can be called to the stand he is said to be "available" even though he might refuse to testify. The majority misinterprets the meaning of the word "available" as used in defining the constitutional right of confrontation. Cf. Mancusi v. Stubbs, 1972, 408 U.S. 204, 92 S.Ct. 2308, 2312–2313, 33 L.Ed.2d 293. If a witness does refuse to testify, the prosecution cannot otherwise introduce his confession. For to do so would be to deny the defendant this right of confrontation. *Douglas, supra.* It is the prosecution which must suffer the consequences if Sellars would have pleaded the Fifth Amendment, not Hoover.

The majority also reasons that had the prosecution put Sellars on the stand prior to his own trial, the State's attorney would have been guilty of possible misconduct. Never have I heard of any such rule or law. The majority cites no authority for its view. Moreover, had the State tried Sellars first, under no theory would there be any misconduct in calling him as a witness at Hoover's trial.

leted,[17] particularly since Stone was relating an oral confession. Where a witness is stating what another person told him, there should be greater latitude to delete objectionable portions of the hearsay than where a written confession is being tendered into evidence. In consonance with Texas law and in an effort to alleviate the improper and pernicious effect of Stone's account of the confession, the trial judge instructed the jury to disregard all references to Hoover. (For the text of that instruction, see majority opinion at 528.) The effect of that instruction is discussed later, *infra* pp. 558–560.

## B. *The Law*

The Sixth Amendment guarantees to every accused "the right * * * to be confronted with the witnesses against him * * *." Its comand was made applicable to the States, through the Fourteenth Amendment, in Pointer v. Texas, 1965, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.[18] Hoover complains that his sixth amendment right of confrontation was thwarted by the introduction of Sellars' confession.

First, the majority contends that even though Sellars was available to testify [19] his confession was admissible to prove that the principals had committed the robbery. In an attempt to buttress that position the majority opines, "If a principal's confession makes no reference to an accomplice, no constitutional question arises." (Majority opinion, at p. 529, n. 15). Quoting from Bruton v. United States, 1968, 391 U.S. 123, 127, 88 S.Ct. 1620, 20 L.Ed.2d 476, the majority states: " 'Evans' oral confessions were in fact testified to, and were therefore in evidence. That testimony was legitimate evidence *against Evans* and to that extent was properly before the jury during its deliberations.' " (Emphasis mine.) But *Bruton* involved a joint trial. All the Supreme Court said was that the jury could consider Evans' confessions in determining *his* guilt. Proof of Evans' guilt was not an element to the crime with which Bruton was charged. In contradistinction, proof of the guilt of the principals in this case (a fact which Sellars' confession tended to show) was an element of the crime with which Hoover was charged. So long as any juror

17. I re-emphasize that Texas law allows the confession only to show that the principals had committed the robbery. If the statement that Hoover had organized the plan were deleted, the impact of Sellars' confession would not have been impaired insofar as it related to the actual perpetration of the crime. Moreover, that statement goes solely to showing that Hoover encouraged the crime beforehand, an element of the offense of accomplice which under Texas law cannot be proved or even corroborated by Sellars' confession.

Similarly, the statement that Hoover was telephoned during the crime adds little, if anything, to the testimony. At most the state court should have permitted testimony which stated only that telephone calls had been made. There was no need to refer to Hoover as the party on the other end of the line. As the majority opinion notes (p. 529), Texas has adopted, at least in part, the English practice of blanking out the names of coindictees. See VII Wigmore, Evidence § 2100(d) (3d ed.).

Finally, the testimony as to what Sellars did with the loot after leaving the Schepps' house does not significantly lend credence to Sellars' admission that a robbery had actually occurred. Even if testimony as to the events which transpired subsequent to the robbery were admitted, there was no reason to permit testimony naming Hoover as being involved. Stone could have simply said that Sellars communicated with "another person" after the crime and followed that person's instructions as to disposing of the stolen goods.

Thus, the majority's view that the state court was correct in holding that deletion of the reference to Hoover would fragment the remainder is, in my opinion, untenable.

18. That *Pointer*, decided April 5, 1965, eight months after Hoover's criminal trial, is applicable to this case is not contested by the majority (majority opinion at 528) and is sustained by the panel opinion (439 F.2d 923).

19. But see note 16, *supra*.

entertained a reasonable doubt that the principals had robbed the Schepps, the jury could not convict Hoover. Yet had the jurors in *Bruton* found Evans innocent they nonetheless could have convicted Bruton. Hence, the majority's reliance on *Bruton* in support of its rationale is specious.

Second, the majority argues that Hoover's sixth amendment rights were not violated when the jury was allowed to hear the references in Sellars' confession tending to implicate him as an accomplice. In my view, applying the Texas rule so as to admit the confession of an available witness violates the Constitution, although it is admitted solely to prove that he (the witness present but not testifying) committed the adjunct crime.[20] Even where the declarant-principal is legitimately unavailable, his confession is not admissible unless there are adequate indicia that his out-of-court statements are true. Assuming *arguendo* that Sellars' confession could be introduced to prove his commission of the robbery, it could not be employed to implicate Hoover even if excision of the inculpatory references would render the confession fragmentary.[21] Moreover, where as in this case the Texas rule (allowing the references to Hoover to come in on the coattails of a confession to the adjunct crime) is not properly followed, there can be no doubt that the right to confrontation has been violated. Finally, it is no answer that Hoover could have called Sellars as a defense witness. Nor will it suffice to say that the references to Hoover contained in Sellars' confession were harmless beyond a reasonable doubt within the meaning of Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 and other cases.

There are, as has been indicated, three levels of inquiry in this case. With Sel-lars available to testify, could the State constitutionally introduce his confession to show that the robbery had been committed? Does the Texas rule violate the Sixth Amendment in that it allows statements incriminating the accomplice to be admitted where their deletion would fragment the confession? And, is the right of confrontation abridged where references to the accomplice could have been deleted in consonance with Texas law and without rendering the remainder of the confession unintelligible, but were not so deleted?

(1) The Validity of the Application of the Texas Rule to an Available Declarant.

Under Texas law, in this case one element of the crime of accomplice was proof beyond a reasonable doubt that the principals committed the underlying robbery. Hoover had every right to defend himself by showing a reasonable doubt as to the principals' commission of the Schepps' robbery. Hence Sellars' confession, even in the limited sense that it tended to establish the robbery, served to bear witness against Hoover. Accordingly, Hoover attacks not only that portion of the Texas rule which allows the jury to hear references implicating him as an accomplice, but also the application of the rule to permit the confession of Sellars, where he was an available witness, to be used to prove the principals' commission of the robbery.

A reading of relevant Supreme Court decisions reveals that, when the declarant does not testify, hearsay evidence as to what he has said is inadmissible unless *both* (a) the declarant is legitimately unavailable, *and* (b) there are strong indicia evincing the truth of the matters asserted by hearsay.[22]

---

20. Two of five justices on the Texas Court of Criminal Appeals have, since deciding Hoover's case, adopted this view of the Texas rule. See *Schepps v. State*, Tex. Cr.App.1968, 432 S.W.2d 926, discussed *infra*, note 29.

21. See footnote 20, *supra*.

22. In this case the State does not contend that Sellars was legitimately unavailable. But see the majority's position discussed in note 16, *supra*. Moreover, the Texas

In Mattox v. United States, 1895, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409, the declarant had testified at Mattox's first trial and had been subjected to cross-examination by Mattox. At a subsequent trial, owing to the intervening death of the declarant, a transcript of his earlier testimony was introduced into evidence. Obviously the declarant was unavailable, in any sense of the word, to testify at the second trial. Since he had been subjected to cross-examination at the earlier trial, the Court held that Mattox's right of confrontation was satisfied. Thus *Mattox* involved a situation where the declarant was unavailable but where there were indicia that his previous statements were reliable.

In Barber v. Page, 1968, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255, the State attempted to introduce declarant Woods' prior testimony given at a preliminary hearing. At the time of trial, Woods was incarcerated in a federal penitentiary. The Supreme Court held that Woods had not been shown to be unavailable because "the state authorities made no effort * * * to secure Woods' presence at petitioner's trial." 390 U.S. at 724, 88 S.Ct. at 1322. Even though there were indicia that Woods' prior testimony was truthful, it could not be admitted into evidence because he was not an unavailable witness. Said the Court:

> "While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable, this is not * * * such a case."

390 U.S. at 725–726, 88 S.Ct. at 1322 (footnote omitted).

In *Barber*, the declarant's prior testimony, even though it bore indicia of reliability, was deemed inadmissible because the declarant was available to testify. Certainly, Sellars' confession should

not have been admitted since he too was available.

Both *Mattox* and *Barber* involved introduction of prior testimony. Douglas v. Alabama, 1965, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934, concerned the State's use of a witness' prior out-of-court confession. In that case the State actually put the declarant, Loyd, on the stand. When questioned about his confession Loyd invoked the Fifth Amendment. The trial judge held the privilege inapplicable because Loyd had already been convicted. Nonetheless Loyd continued in his refusal to answer. Upon the prosecution's request the trial judge declared Loyd hostile to the State; and "[u]nder the guise of cross-examination to refresh Loyd's recollection, the [prosecutor] purported to read from the [written confession]." 380 U.S. at 416, 85 S.Ct. at 1075. The written document was never introduced into evidence, although three police officers testified that the confession was Loyd's.

The Supreme Court held that Douglas' right of confrontation had been violated:

> "In the circumstances of this case, petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. * * * Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement * * *. Since the [prosecutor] was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to but not admitted by him. Nor was the opportunity to cross-examine the law enforcement officers adequate to redress this denial of the essential right secured by the Confrontation Clause. * * *

rule of evidence here scrutinized recognizes that Sellars' confession insofar as

it contains references to Hoover, should not be considered by the jury.

"Hence, effective confrontation of Loyd was possible only if Loyd affirmed the statement as his."

380 U.S. at 419–420, 85 S.Ct. at 1077 (citations omitted).

*Douglas* is clear authority for the proposition that an available witness must actually testify to afford the accused his right of confrontation. (See note 16, *supra.*) In Hoover's case, Sellars was available but did not testify. Hence the prosecution could not rightfully have introduced Sellars' confession by way of Officer Stone. In *Douglas,* the confession was never put into evidence, but the Court held that the prosecutor's restatement of it was enough to violate the Sixth Amendment. Here Sellars' confession was put into evidence. It carried greater weight than did the prosecutor's remark in *Douglas.* Hoover's case is, therefore, stronger than Douglas' for finding an abridgment of the confrontation right.

The majority makes reference to California v. Green, 1970, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. In my mind that case supports the view that Hoover's sixth amendment right was denied. In *Green,* Porter was arrested for possession of marihuana and named Green as his supplier. At a preliminary hearing Green cross-examined Porter extensively. 399 U.S. at 151, 90 S.Ct. 1930. Nonetheless, Porter remained steadfast in pointing the finger of guilt at Green. At trial Porter took the stand but refused to reiterate his earlier statement. The prosecution read to Porter portions of his testimony given at the preliminary hearing. At that juncture Porter admitted that he had in fact named Green as his supplier but complained that he could no longer remember whether it was true. The trial court admitted the preliminary hearing testimony as substantive evidence. Moreover, the arresting officer testified as to Porter's prior confession. The policeman's testimony was also admitted as substantive evidence.

The Supreme Court held that Green's right of confrontation was satisfied. Granted the policeman's testimony was

hearsay, and so too were Porter's preliminary hearing statements. But, said the Court:

"Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

"It is, of course, true that the out-of-court statement may have been made under circumstances subject to none of these protections. *But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections.* If the witness admits the prior statement is his [as he did in *Green*], or if there is other evidence to show the statement is his, the danger of faulty reproduction is negligible and the jury can be confident that it has before it two conflicting statements by the same witness. Thus, as far as the oath is concerned, the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury; indeed, the very fact that the prior statement was not given under a similar circumstance may become the witness' explanation for its inaccuracy—an explanation a jury may be expected to understand and take into account in deciding which, if either, of the statements represents the truth."

399 U.S. at 158–159, 90 S.Ct. at 1935 (footnote omitted) (emphasis supplied).

Thus the dispositive fact was that Porter had been called as a prosecution witness at Green's trial. Porter's appearance on the stand convinced the Court that the right of confrontation was intact. As the Court noted, "none of our decisions interpreting the Confrontation

Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial." [23] 399 U.S. at 161, 90 S.Ct. at 1936. In Hoover's case, Sellars was available but did not testify. Moreover, in *Green* the defendant had an opportunity to cross-examine Porter at the preliminary hearing. In this case Hoover had no such access to Sellars. Clearly, *Green* is inapposite to this case.

In sum, Sellars' availability prevented the State from introducing his confession through Officer Stone's mouth. Yet, even if Sellars' mere availability does not command this result it nonetheless obtains. For there were not sufficient indicia of the reliability of Sellars' confession.

In Pointer v. Texas, 1965, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, a transcript of declarant Phillips' prior testimony at a preliminary hearing was introduced into evidence at Pointer's trial. Phillips had left the jurisdiction in the interval between the hearing and trial. Hence he was unavailable to testify. Nonetheless, the Supreme Court held it error to admit the transcript, "[b]ecause the transcript of Phillips' statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine Phillips * * *." 380 U.S. at 407, 85 S.Ct. at 1070. In other words, had petitioner been able to cross-examine Phillips on a prior occasion, there would have been sufficient indicia of reliability to warrant introduction of the hearsay testimony. In the present case Hoover had no such opportunity to cross-examine Sellars. *Pointer* squarely held that, even though the declarant is legitimately unavailable, there must be strong indicia of reliability (such as are afforded by cross-examination) before the Court will accept hearsay testimony of the declarant's prior statements.

Dutton v. Evans, 1970, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213, is another case to which the majority turns for support. *Dutton* involved interpretation of a well-established, but peculiar, rule of law in Georgia. Under that State's law of conspiracy, statements of one conspirator are admissible against his cohorts even when made during the concealment stage of the conspiracy.

Evans, Truett and Williams were accused of conspiracy to commit murder and of murder. Evans was tried separately. During the trial Shaw testified that, while he was in jail with Williams, Williams had told him, "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." 400 U.S. at 77, 91 S.Ct. at 214. Evans complained that he had been denied confrontation of Williams. The Court upheld the Georgia rule permitting introduction of Shaw's testimony.

It is of prime significance that only four members of the Court found the Georgia rule to satisfy the right of confrontation. (Opinion of Justice Stewart, concurred in by Chief Justice Burger, Justices White and Blackmun.) Four Justices vigorously disagreed with that view. (Opinion of Justice Marshall, concurred in by Justices Black, Douglas and Brennan.) The swing vote was cast by Justice Harlan who refused to test the Georgia rule by the Sixth Amendment but rather chose to scrutinize it through the spyglass of due process. Hence, there is no clear holding of the Court.

Justice Stewart noted that "Evans was not deprived of any right of confrontation on the issue of whether Williams actually made the statement related by Shaw," because Shaw was competent to testify as to that fact. 400 U.S. at 88, 91 S.Ct. at 219. Rather:

"The confrontation issue arises because the jury was being invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for

---

23. In *Douglas* the declarant was not actually testifying, thus the Court excluded references to his earlier confession.

his predicament. But we conclude that there was no denial of the right of confrontation as to this question of identity. First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant."

400 U.S. 88–89, 91 S.Ct. 219–220. Additionally, the singular fact which prompted Justice Stewart's view was that "the possibility that cross-examination of Williams could conceivably have shown the jury that the statement, though made, might have been unreliable was wholly unreal." *Id.* at 89, 91 S.Ct. at 220. After all, why would Williams have incriminated himself to Shaw, a mere fellow prisoner if he were not in fact guilty?

Hoover's case is totally distinct from *Dutton,* and as such the majority's reliance thereon is wholly misplaced. There were not sufficient indicia of reliability with respect to Sellars' confession. Comparing the facts of this case to those in *Dutton,* I note the following: (1) Unlike Williams' statement in *Dutton* Sellars' confession contained express assertions of past fact (including assertions with respect to Hoover's involvement in the crime); (2) where the declarations in *Dutton* were spontaneous and were made by Williams to one from whom no favor could be expected in return, Sellars' statements were elicited during a custodial investigation where it would have been natural for the declarant to seek any favor possible and where it might have been in his interest to admit his own role in the crime as long as he implicated Hoover in the same breath;[24] and (3) while all of Williams' statement in *Dutton* was against his penal interests, that portion of Sellars' statement implicating Hoover was not similarly against Sellars' interest.[25]

24. Sellars' judgment of the importance which the State attached to fastening guilt on Hoover would be borne out by the subsequent grant of complete immunity to Spivey in exchange for his testimony against Hoover.

25. Notably the Texas Court of Criminal Appeals, the highest criminal court in Texas, has recently said, with respect to use of a principal's confession which implicates the alleged accomplice who is on trial separately:

"One could speculate at length as to why people confess—fear, duress, conscience, revenge, reward, offers of immunity, or leniency, etc.

"While a confession is admissible against the person making the same as a declaration against interest, what he says therein about others may be based on spite, on fear, pique, malice, or other motives not leading to the truth. When the State has laid the proper predicate to authorize the introduction into evidence of the principal's confession, does this assure the trustworthiness of the instrument, without the accused's right of cross-examination, or to test the recollection of the principal and without the opportunity for the jury to observe the principal's demeanor? I think not. Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, 942 (Opinion denying State's Motion for Rehearing) (three of five justices concurring). In light of the inherent unreliability of a principal's implication of his accomplice, this Court

The majority would view Justice Stewart's opinion in *Dutton* as authorizing hearsay testimony although the declarant is available. Yet, as noted above, even if the majority's interpretation of Justice Stewart's opinion were correct, there were not sufficient indicia of reliability to warrant Stone's testimony.[26]

More importantly, Justice Stewart's opinion should not be read so broadly. First, as noted in the opinion of the original panel in this case:

> "*Dutton* held that state evidentiary rules may vary from the federal rules in that a statement by one conspirator may be used against another if the statement is made during the time the overt offense is past but during the time in which the conspirators are attempting to avoid being identified. In effect, the state and federal rules may differ on what constitutes the 'pendency of the conspiracy.' But even the most strained construction of the hearsay exception cannot bring a conspirator's confession under the penumbra of 'in furtherance of' or 'during the pendency of' the conspiracy."

Panel opinion, 439 F.2d at 924 n. 6. The Court in *Dutton* was reviewing a Georgia rule of evidence. That rule was predicated in turn on a substantive rule in Georgia that the conspiracy continues through the concealment stage. Consequently any statement made during the pendency of or in furtherance of the conspiracy was admissible against the co-conspirator. Yet in this case Sellars' statement was made even after the concealment stage. And, as we said before, no rule of law could include within the period of a conspiracy statements made to the police in confession of the crime.

Since *Dutton* involved a peculiar Georgia law, Justice Stewart's rationale, even if incorrectly read as broadly as the majority would have it, does not apply to the facts of this case.

Second, I reiterate that there was no majority opinion in *Dutton*. Justice Stewart's opinion is not the opinion of the Court. Justice Marshall, with whom three Justices also joined, would have stricken Shaw's testimony because Williams was available to be called by the State. He did not draw the distinction which Justice Stewart did on the peculiarity of Georgia's substantive law of conspiracy, a distinction which certainly cannot be drawn in this case.

Third, the goal of the confrontation clause, as noted in *Green* and acknowledged in *Dutton*, is to get at the truth. Conceivably the Georgia rule of law at issue in *Dutton* was aimed at that end. In this case, at least insofar as Sellars implicated Hoover, even Texas realizes that its rule is not geared solely to finding the truth. For the law of Texas commands that the jury be instructed to disregard any statements implicating the accomplice.

Fourth, to give Justice Stewart's opinion in *Dutton* the broad reading suggested by the majority would be to overrule the unquestionably sound holdings in cases such as Barber v. Page, *supra*, which were cited by Justice Stewart with approval.

In sum, I would adhere to the general principal that if the declarant is available, it is he who must testify; and that if the declarant is unavailable, there must be strong indicia of reliability before hearsay statements may be introduced against the defendant.[27] In this

---

should not imbue Sellars' confession with the requisite indicia of reliability.

26. The majority recognizes the need for such indicia (majority opinion at 532–534) and even asserts that "the record must affirmatively show those indicia." *Id.* at 533. Nowhere in its opinion does the majority demonstrate adequate indicia of the trustworthiness of Sellars' confession, particularly insofar as it implicates

Hoover. It cannot be over-emphasized that in this case that is the most important, indeed critical, part of Sellars' confession.

27. Since the preparation of this dissenting opinion, the United States Supreme Court has cogently confirmed the two-part test which I urge. Mancusi v. Stubbs, cited *supra*, n. 16. That is, in order to introduce hearsay statements of a non-appear-

case, Sellars was neither unavailable nor were there sufficient indicia of reliability supportive of the truth of his confession, particularly with respect to that portion of his confession which implicated Hoover. Hence, under any view of the Confrontation Clause, Stone's recital of Sellars' confession was inadmissible.

Kirby v. United States, 1899, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890, appears to be direct authority for my view of this case. *Kirby* has been cited with approval in Pointer v. Texas, *supra*, 380 U.S. at 404, 410, 420, 85 S.Ct. 1065. Kirby was charged with receiving stolen goods. As an element of the crime, the Government was required to prove the guilt of the three alleged thieves. The trial court admitted evidence that the three principals had all been convicted, two of them upon pleas of guilty. I note that two of the convictions include confessions by the principals. The principals themselves were not called as witnesses against Kirby. In holding the Government's practice violative of Kirby's sixth amendment right of confrontation, the Court opined:

"Notwithstanding the conviction of [the principals], it was incumbent upon the government, in order to sustain its charge against Kirby, to establish beyond a reasonable doubt (1) that the property described in the indictment was in fact stolen from the United States * * *.

" * * * * * *

" * * * The record of the conviction of the principals could not, however, be used to establish, against the alleged receiver, charged with the commission of another and substantive crime, the essential fact that the property alleged to have been feloniously received by him was actually stolen from the United States. Kirby was not present when [two of the principals] *confessed their crime* by pleas of guilty, nor when [the third] was proved to be guilty by witnesses who personally testified before the jury."

174 U.S. at 53–54, 19 S.Ct. at 576–577 (emphasis supplied).[28] Hoover's case is indistinguishable. Sellars could have been called; he was not. The State must bear the consequences.[29]

---

ing declarant, the State must show both that he is legitimately unavailable *and* that there are strong indicia of reliability of the hearsay statements. All nine Justices agreed that such a two-part approach is required by the Sixth Amendment, though Justices Marshall and Douglas felt that the test had not been satisfied on the facts of that case.

28. See also, Commonwealth v. Elisha, 3 Gray 460.

29. In Schepps v. State, Tex.Cr.App.1968, 432 S.W.2d 926, two of five justices held the Texas rule to be violative of the sixth amendment right of confrontation where a non-appearing declarant is available to testify. (Oddly enough, that case involved a prosecution of Mair Schepps, the victim here, but there charged as an accomplice to counterfeiting cigarette tax stamps.) In *Schepps* the confessions of three available principals to the crime were introduced to prove that they had committed the adjunct crime. As in this case, the confessions contained references to the accomplice which could have been excised without destroying the continuity of the confessions. Two justices held the

confessions to be entirely inadmissible, even for the limited purpose of establishing the principals' guilt, since the principals themselves could have been called as witnesses. A third justice found error because, as in this case, the trial judge could have required deletion of the references to the alleged accomplice without fragmenting the confession.

Said two of the justices:

"In the case at bar the State made no effort to demonstrate any great probative need for the evidence or to show that the alleged principals were actually unavailable to the prosecution as witnesses; they merely relied upon the old [rule]."

432 S.W.2d at 942. Similarly, in Hoover's case the prosecution failed to make such efforts. Rooting their holding to the rationale of *Bruton*, and other cases discussed *supra*, the two justices continued:

"Certainly it may be argued that none of these decisions involved the admissions of an alleged principal's confession at the separate trial of an accomplice, but we cannot waltz around the important constitutional issue here involved and validly distinguish the cases

**(2) The Limiting Instruction.**

The majority emphatically asserts that Hoover's right of confrontation was not abridged even insofar as Sellars' confession directly implicated Hoover as an accomplice. I cannot agree. Assuming *arguendo* that Sellars' confession was admissible to prove the principals committed the robbery (which it was not),[30] the Sixth Amendment does not permit introduction of Sellars' confession to show that Hoover was an accomplice. Even prior to the decision in *Schepps, supra,* Texas itself recognized the impropriety of utilizing confessions to such end. Hence State law forbade remarks inculpatory of the accomplice, at least where their inclusion was not inextricably tied to the remainder of the confession. In this case it is clear beyond cavil that the state court failed to exclude references to Hoover which could have been deleted

without rendering Sellars' confession even slightly unintelligible.[31] That error rises to constitutional proportions in this case.

More importantly Texas cannot permit the jury to hear Sellars' alleged references to Hoover even if their omission would unduly fragment the confession. In Bruton v. United States, 1968, 391 U. S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, two defendants, Bruton and Evans, were jointly tried for violating postal laws. The oral confession of Evans was introduced by way of testimony from a postal inspector. The confession incriminated Bruton as well. The jury was instructed to consider the confession only with respect to Evans and to disregard all references to Bruton. In a carefully reasoned opinion the Supreme Court held the limiting instruction to be

by simply color matching the facts. We cannot adopt the luxury of merely saying this case involved the use of examining trial testimony, this one did not; that case was a joint trial, this one was not.

" * * * * * *

"The State, of course, was required to prove the guilt of the alleged principals in the case at bar in order to convict the appellant as an accomplice, and it was entitled to present all the legitimate evidence it possessed to sustain its burden of proof despite the fact the evidence already presented appeared to have clearly established that element of the offense charged. The State, however, because of its burden of proof, was not entitled to introduce the extrajudicial confessions of three of the alleged principals in violation of the appellant's federal and state constitutional right of confrontation.

"In the case at bar, despite appellant's objections, the State made no effort to show that the appellant had previously been afforded an adequate opportunity to be confronted by and to cross-examine the three principals whose confessions were used *and that they were presently unavailable to the State* so as to bring the case within the recognized exception to the constitutional right of confrontation. See Barber v. Page, supra."
432 S.W.2d at 943 (emphasis supplied).

The Texas court has since reaffirmed the validity of the holding in *Schepps.* See Tucker v. State, Tex.Cr.App.1971, 461 S.W.2d 630, 634 (" * * * Schepps, supra, has effectively overruled [prior state] cases * * * to the extent that they allow introduction of the principal's confession in the trial of the accomplice * * *."); Carey v. State, Tex.Cr.App. 1970, 455 S.W.2d 217, 220. And contrary to the majority's statement in footnote 10 of its opinion, Chapman v. State, Tex.Cr.App.1971, 470 S.W.2d 656, in no way undermines the *Schepps* decision.

30. The majority apparently would argue that Sellars' confession of his own guilt was admissible since it was an admission against interest. Nonetheless, I reiterate, Sellars' confession is wholly inadmissible because he was available to testify. Moreover, although the fact that Sellars confessed to a capital crime is certainly strong indication that he was to that extent telling the truth, it must be borne in mind that his confession was given in a custodial environment. And while confessing, he implicated Hoover as the mastermind, perhaps hoping for a bargain approaching that accorded to Spivey—complete immunity in exchange for his testimony against Hoover.

31. See discussion, *supra* at pp. 548–550 & Appendix A.

of no avail. Bruton's right to confront Evans was abridged.[32]

Prior to *Bruton* the Court had adhered to the philosophy expounded upon in Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278. Said the Court in *Bruton*:

"The basic premise of *Delli Paoli* was that it is 'reasonably possible for the jury to follow' sufficiently clear instructions to disregard the confessor's extrajudicial statement that his codefendant participated with him in committing the crime. 352 U.S., at 239 [, 77 S.Ct., at 299]. * * *

" * * *

"*Delli Paoli* assumed that [the] encroachment on the right to confrontation could be avoided by the instruction to the jury to disregard the inadmissible hearsay evidence. But, as we have said, that assumption has since been effectively repudiated. True, the repudiation was *not* in the context of the admission of a confession inculpating a codefendant but in the context of a New York rule which submitted to the jury the question of the voluntariness of the confession itself. Jackson v. Denno, 378 U.S. 368 [, 84 S.Ct. 1774, 12 L.Ed.2d 908]. Nonetheless the message of *Jackson* for *Delli Paoli* was clear. We there held that a defendant is constitutionally entitled at least to have the trial judge first determine whether a confession was made voluntarily before submitting it to the jury for an assessment of its credibility. More specifically, we expressly reject-

ed the proposition that a jury, when determining the confessor's guilt, could be relied on to ignore his confession of guilt should it find the confession involuntary. *Id.*, at 388–389, 84 S.Ct., at 1786–1788."

391 U.S. at 126–129, 88 S.Ct. at 1622–1624 (footnote omitted) (omissions by the Court). The command of *Bruton* is resolute: " 'The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction,' " 391 U.S. at 129, 88 S. Ct. at 1624, quoting from Krulewitch v. United States, 1946, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (Jackson, J., concurring). Clearly in light of *Bruton* it would be wrong to conclude that the jury which convicted Hoover disregarded Sellars' references to Hoover.

The majority sedulously suggests that *Bruton* is distinguishable, first since *Bruton* involved a joint trial whereas Hoover was tried separately. The decisiveness of that factor escapes me. Sellars' statements were no less damaging because he was not on trial. We must look to the harm inflicted on Hoover. It is identical to the injury suffered by Bruton. Next, says the majority, "While coconspirators are coequals in crime as a matter of substantive criminal law, principals and accomplices are not." Majority opinion at 530. Be that as is may, the jury's collective mind is no less infected owing to a subtle distinction between the substantive law of conspiracy and the crime of accom-

32. Although the Court in *Bruton* emphasized that it was not faced with a challenge to any well-established exception to the hearsay rule, its denunciation of the efficacy of a limiting instruction nonetheless bears on this case with equal force. We are looking at the effect of the testimony on the minds of the jurors, and they are no less prejudiced because some rule of evidence is at issue. Furthermore, under the Texas rule any direct references to the alleged accomplice are inadmissible. (They can be heard if to delete them would render the remainder of the confession unintelligible, but they are nonetheless inadmissible.) Thus it

could be said that there is no well-established exception to the hearsay rule at issue in this case since the references to Hoover contained in Sellars' confession were not actually admissible into evidence.

Furthermore, as the Texas high court has said of Bruton's application to the very rule here under scrutiny: "The reliance * * * upon [a] jury instruction[s] to remove the harmful effect is the same reliance utilized in the now overruled [by *Bruton*] Delli Paoli case." *Schepps supra*, 432 S.W.2d at 941 (three of five justices concurring).

plice. Finally, the majority notes that "in this case the State was required to prove Sellars' guilt as a prerequisite to the conviction of Hoover as an accomplice; there was no such prerequisite in *Bruton*." *Id.* at 530. Yet in *Bruton* the prosecution had an equally, if not more, compelling reason to introduce Evans' confession. The Government was duty bound to seek his conviction, just as the State was obliged to prove the principals' guilt in this case.

The majority seemingly avers that the rule in *Bruton* is not absolute—that the trial judge in his discretion may conclude that the particular jury before him will actually disregard inadmissible statements like the one here at issue:

> "[A]n examination of the testimony taken during the voir dire examination of certain prospective jurors on which the defendant took a bill of exception shows extensive questioning of virtually every juror as to his ability to consider confessions as evidence only in accordance with the Court's instructions. Nothing in this record convinces us that they did not.
>
> "In short, we do not think that it was unreasonable for the State Trial Judge to conclude, in the exercise of reasonable discretion, that a limiting instruction to the jury could take care of any possible adverse effect, because of the admission of Sellars' oral confession."

Majority opinion at p. 530. Yet nowhere in the *Bruton* opinion does the Supreme Court suggest, intimate or imply that the trial judge is to be afforded any such discretion.[33] The majority's view is, I respectfully submit, entirely erroneous.

Hence, insofar as *Bruton* impugned the effectiveness of a limiting instruction in the context of confession implicating another's participation in a crime, this Court must pay the case its proper heed. Texas has sought to say that on balance any harm inflicted on Hoover by Sellars' references to him is offset by a limiting instruction. Even assuming *arguendo* that Sellars' confession was admissible to prove his role in the robbery, it is clear that Texas' effort at balancing fails to withstand even the meekest breeze redounding from *Bruton*.[34]

(3) Hoover's Right to Call Sellars to the Stand

Sellars could have been called to the stand by Hoover. Although the majority does not rely on any such theory, I am constrained to re-emphasize what was said in the opinion of the original panel in this case:

> "That Sellars was available to be called as a witness does not mitigate the prosecution's misconduct here. The State sought to shift to the defendant the risk of calling Sellars to the stand. To accept the State's argument that the availability of Sellars is the equivalent of putting him on the stand and subjecting him to cross-examination would severely alter the presumptions of innocence and the burdens of proof which protect the accused. Hoover's undoubted right to call Sellars as a witness in his behalf cannot be substituted for his Sixth Amendment right to confront Sellars as a witness against him."

439 F.2d at 924.[35]

---

33. Indeed the Court noted "the impossibility of determining whether in fact the jury did or did not ignore" the objectionable testimony. 391 U.S. at 136, 88 S.Ct. at 1628.

34. And in Schepps v. State, Tex.Cr.App. 1968, 432 S.W.2d 926 (three of five justices concurring), the Texas court overruled its prior position adopting the stated

view of *Bruton*. See discussion, *supra*, notes 29, 32.

35. To similar effect see the remarks of Mr. Justice Marshall in his dissent to *Dutton, supra*, 400 U.S. at 102 n. 4, 91 S.Ct. at 226: "[I]t remains that the duty to confront a criminal defendant with the witnesses against him falls upon the *State*, and here the State was allowed

Moreover, it is not at all clear whether Sellars would have testified had Hoover called him. At the time of Hoover's trial, Sellars had not yet been tried. Hence he might well have asserted his fifth amendment privilege against self-incrimination. In Douglas v. Alabama, *supra*, the Supreme Court held that, where a witness takes the stand and pleads the Fifth Amendment, the prosecution cannot introduce, even obliquely, the witness' prior confession. To allow the State to introduce Sellars' confession in this case would by indirection subvert the rule in *Douglas*.

In that same vein, even if Sellars would have testified, it is not clear that Hoover would have been given the right of cross-examination. Ordinarily, one cannot cross-examine his own witness. Only when the trial judge, in his discretion, declares the witness hostile does the right of cross-examination inure. Of course, as the majority points out, cross-examination is not synonymous with confrontation. Rather confrontation is broader. It includes the right of cross-examination. *E. g.*, Pointer v. Texas, *supra*, 380 U.S. at 404, 85 S.Ct. 1065. And if cross-examination is not afforded, some other indicia of the reliability of the declarant's statements must be present. *Cf.* Dutton v. Evans, *supra*. In this case there were no other adequate indicia.[36] Hence, the right to cross-examine Sellars was constitutionally mandated in this case. Hoover's right to confront Sellars simply cannot turn on the trial court's discretionary power to declare Sellars hostile. Moreover, even if Hoover were permitted to cross-examine Sellars, it appears that Hoover would not have been allowed to impeach him. Under Texas law, in order to impeach his own witness, Hoover would have to demonstrate surprise. See 62 Tex.Jur.2d §§ 327-28. Hoover could not claim surprise had Sellars taken the

stand and affirmed his earlier confession.

## III. *Harmless Error*

The majority states that the original "panel's cryptic rejection of the 'harmless error' rule \* \* \* was patently erroneous" (opinion at p. 539); I must similarly spurn the majority's inadequately supported statement that even aside from Sellars' confession the evidence against Hoover was "overwhelming" (*id.* at 533) as well as "manifest and overpowering" (*id.* at 537). It is not necessary to consider "harmless error" with respect to the question whether the principals named in the indictment committed the Schepps' robbery. It is sufficient to demonstrate that the error was not harmless insofar as Sellars' confession implicated Hoover.

The "harmless error" rule as it relates to constitutional error was expounded upon in Chapman v. California, 1967, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705: " 'The question is whether there is a *reasonable possibility* that the evidence complained of *might have* contributed to the conviction,' " *quoting from* Fahy v. Connecticut, 1964, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (emphasis mine). Continuing, the Court said that to avoid reversal the beneficiary of the error must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24, 87 S.Ct. at 828. In sum, the court must be convinced that the error "was harmless beyond a reasonable doubt." *Id.*

The majority undertakes to recount Spivey's detailed, sordid account of the robbery including its references to Hoover. Somehow, I suppose, the majority believes Spivey's testimony gains credence through repetition. Of course Spivey singularly lacked credibility. He

to introduce damaging evidence without running the risks of trial confrontation." (Emphasis in original.) And see Barber v. Page, *supra*, where the State was required to make a good faith effort to pro-

duce the declarant before the Court would admit hearsay evidence of the declarant's prior statement.

36. See discussion, *supra* at 555.

was given complete immunity. Under Texas law his testimony, unless corroborated, cannot convict Hoover. Was it sufficiently corroborated? The jury might well have answered that question in the negative.

Interspersed in the majority's lengthy narration of Spivey's testimony are three excerpts from the evidence submitted at Hoover's trial, which the majority views as "overwhelming." First, Mrs. Tuck and the Schepps testified that during the robbery the three masked assailants phoned an unidentified party, seemingly for advice. At most that testimony confirms that the robbers made telephone calls during the crime. And it should be borne in mind that the jury had the right to conjecture that Spivey, as a prosecution witness, may have been aware of what the other witnesses were going to say. The similarity in versions might be less than fortuitous.

Second, Hoover was found in possession of certain diamonds which a jeweler rather hazily identified as belonging to the Schepps.[37] Even if the jurors accepted the identification, they might have believed that since Hoover was Spivey's attorney he somehow came into possession of the stones after the robbery and without having played a role in planning the crime. To convict Hoover as an accomplice, the State must prove that he encouraged the adjunct crime before the act. Possession of the diamonds does not imply such a role. Finally, as has been demonstrated, the diamonds should not have been introduced into evidence at all, having been seized in violation of the Fourth Amendment.

Third, the majority puts great emphasis on William J. Lyon's testimony. The jury might have disbelieved all or part of Lyon's testimony. The witness was nineteen years of age and had been convicted of breaking and entering. According to his story, Hoover had shown him a man's diamond ring and had told him the ring was from the Schepps' robbery. There appears no reason for Hoover to make the statement and engage in the conduct to which Lyon testified. Even more incredible is Lyon's testimony that for the paltry sum of $150 he, his mother and his three brothers left Texas to avoid testifying. Finally, Lyon testified only that "[Hoover] said it was *probably* a hot ring and it *probably* came from the Schepps' robbery." (R. 718) (emphasis supplied). That statement does not support an inference that Hoover encouraged the robbery before it was committed. On the other hand, it is clear that Hoover was representing Lyon in a probate matter and that Lyon never received any money or property under the will at issue. That fact might weaken in the jury's mind the weight of Lyon's testimony. Though it is not for us as appellate judges to pass upon Lyon's credibility, we would be remiss in ignoring the jury's prerogative to do so.

The evidence tending to show that Hoover had urged the robbery was scant. Only Spivey testified directly to that point. Yet the trial court allowed the jury to hear similar inculpatory remarks extracted from Stone by the prosecution during Stone's account of Sellars' confession. Can it truly be said that there is not a "reasonable possibility" Sellars' alleged statements "might have contributed to the conviction"? *Chapman, supra*, 386 U.S., at 23, 87 S.Ct. at 827. I think not.

The majority relies heavily on the decision in Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. In that case the State introduced the confessions of two nontestifying co-

---

37. "He testified that the largest stone was a round cut, fine white diamond weighing 4 carats and 83 points and looked the same as a round cut, fine white diamond he had previously mounted for Mr. Schepps; and that the smaller stone introduced in evidence was an emerald cut diamond weighing 2 carats and 70 points and was similar to an emerald cut diamond of that identical weight in a pendant on which he had previously done work for Mrs. Schepps." Panel opinion, 439 F.2d at 921.

defendants which placed Harrington at the scene of the crime. But importantly, Harrington himself had admitted his presence at the scene, though he disputed his participation in the crime. It is obvious that the confessions of the two codefendants were merely cumulative to Harrington's own admission. In my mind Sellars' confession was clearly prejudicial. Without its benefit the jury would have been compelled to draw inference upon inference to find evidence corroborative of Spivey's testimony.[38] Thus, even assuming *arguendo* that it was harmless error to admit Sellars' confession to prove the principals' commission of the robbery, admission of the references to Hoover makes reversal necessary.

At most this case is like *Chapman* in that it involved a "reasonably strong 'circumstantial web of evidence.'" 386 U.S. at 25, 87 S.Ct. at 829. But, as in *Chapman*, absent the constitutional error "honest, fair-minded jurors might very well have brought in [a verdict of] not-guilty. Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt that the [constitutional infirmity] did not contribute to" Hoover's conviction. *Id.* at 26, 87 S.Ct. at 829.[39]

For the foregoing reasons the original panel was clearly correct in holding that Hoover's conviction had been obtained by the introduction of the fruits of the nighttime search of his home, made in violation of his fourth and fourteenth amendment rights, and by the introduction of Stone's account of Sellars' confession in violation of Hoover's sixth and fourteenth amendment rights, and that neither one of these constitutional errors can be held harmless. The district court's denial of Hoover's habeas petition should be reversed. I respectfully dissent.

---

## APPENDIX "A"

Note the following colloquy:

"A. [Sellars] stated that he and John Oscar Young and Samuel Spivey were the individuals who went into Mr. and Mrs. Schepps' house.

"Q. Do you recall whether or not Sellars stated at that time during the conversation how the three of them got together?

"A. Yes Sir.

"Q. How was that?

"A. Sellars told me that he received a telephone call from Sam Hoover asking him to take part in this robbery * * *."

(R. 535–36.) It is apparent that the prosecution was not content to let Stone begin at the beginning (of the robbery); rather, the prosecution wanted Stone to go back in time.

After recounting the details of the robbery and after describing the items stolen, the prosecution sought a detailed description from Stone as to what Sellars had said of the events following the actual robbery. Stone's account was re-

---

38. Of course the jury was instructed not to consider the references to Hoover contained in Sellars' confession. Yet in light of *Bruton* and *Schepps*, *supra*, this Court is not justified in believing that they followed the instruction.

39. To hold that the constitutional violations in this case were harmless error would do great harm to the jurisprudence. The words of the Supreme Court in Bumper v. North Carolina, 1968, 391 U.S. 543, 550 n. 16, 88 S.Ct. 1788, 1793, 20 L.Ed.2d 797 bear repeating:

> "This suggestion [that the error was harmless] seems to rest on the 'horrible' facts of the case, and the assumption that the petitioner was guilty. But it is not the function of this Court to determine innocence or guilt, much less to apply our own subjective notions of justice. Our duty is to uphold the Constitution of the United States."

plete with and permeated by references to Hoover:

"A. [Sellars] told me that he took all the articles in this jar home with him and he later called Sam Hoover and told him he had the articles and was going to throw them away. He stated he was advised not to throw them away and above all not to throw away the necklace, to bring the whole loot over to Pasadena and let Mr. Hoover look it over.

"Q. What did Sellars tell you he did with reference to that?

"A. He stated after he talked to him he started to Pasadena—

"Q. Talked to whom?

"A. Mr. Hoover, and he started for Pasadena and he thought some City Detectives were about to arrest him and he went into a small grocery store, a Chinese grocery store on Edwards Street and went in like he was going to buy something and he took the necklace and hid it under a soap box. I think he said he bought some hair oil or a pocket comb and started back out of the grocery store and either while he was in the grocery store or after he had stepped out, he was stopped by some City Officers and questioned.

"Q. Was he taken into custody at that time?

"A. No sir.

"Q. What did he do then according to his story?

"A. He told me he then went back home and called Sam Hoover again and told him he had been stopped and told him he hid the necklace in the store, and he told me Sam told him to stay away from the place and not go back because he may be followed, being watched, and he said he waited about three or four hours and went back to the store and looked under the soap box and the necklace was still there where he placed it. He then took the necklace and went to Sam Hoover's house in Pasadena and was let in through the rear door and he stated at that time he showed him the necklace.

"Q. Showed who the necklace?

"A. Sam Hoover. He showed Sam Hoover the necklace.

"Q. What else?

"A. He stated that Sam Hoover told him to sit down and wait and he left the house itself and walked out in the back yard and was gone for a period of ten or fifteen minutes and came back and handed him back the mounting and that the diamonds had been removed.

"Q. What, if anything, did Sellars say he did with the mounting after the diamonds were removed?

"A. He said when Sam Hoover gave him the mounting back it was wrapped in a small piece of blue paper. Sam Hoover told him to dispose of the mounting.

"Q. Did he say he did so or not?

"A. He stated he did, that he disposed of it on the way back to Houston, that he threw it into a horse pasture, and he stated to me before he threw it away he carried it in his mouth and he had chewed it and bit it with his teeth to compress it into a small item and as he passed the horse pasture he tossed it out in the pasture while he was still driving at about a thirty mile an hour speed limit."

(R. 541–44.)

Only after having thoroughly questioned Stone about the events subsequent to the robbery (remember, the confession was admitted solely to prove the principals' commission of the robbery itself) did the prosecution backtrack and ask: " * * * [Did] Sellars [make] any reference to a phone call or two

[made during the robbery]?" The following colloquy ensued:

"A. Yes sir, he did.

"Q. What did he tell you in that regard?

"A. They were to receive their instructions from Sam Hoover after they got into the house as to how to proceed and as to where to look for the money.

"Q. And did they follow those instructions?

"A. Calvin told me they did receive the phone call. They made one and talked to Sam Hoover. They did receive instructions and they did look where they were told to look.

"Q. Do you recall whether or not Sellars told you who actually called the defendant Hoover?

"A. I believe to the best of my knowledge he stated John Oscar Young called him."

(R. 544–45.)

GEWIN, Circuit Judge, concurring in part and dissenting in part (with whom RIVES and GODBOLD, Circuit Judges, join in that portion of the opinion dealing with confrontation and harmless error):

I fully concur in the opinion of the majority that Hoover consented to the search of his home. In my view Hoover invited the officers to search his home. I disagree with that portion of the dissent which would hold that Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) establishes a *per se* rule that there can be no consent to a search once the officers have disclosed that they possess a search warrant. Judge Rives makes much of the fact that the Court in *Bumper* did not specifically limit its holding to the peculiar circumstances to that case. (Rives, J. dissenting, p. 546). However the Supreme Court was clearly influenced substantially by the facts in *Bumper*. Mr. Justice Stewart graphically summarized the factual setting:

"The petitioner lived with his grandmother, Mrs. Hattie Leath, a 66-year-old Negro widow, in a house located in a rural area at the end of an isolated mile-long dirt road. Two days after the alleged offense but prior to the petitioner's arrest, four white law enforcement officers—the county sheriff, two of his deputies, and a state investigator—went to this house and found Mrs. Leath there with some young children. She met the officers at the front door. One of them announced, 'I have a search warrant to search your house.' Mrs. Leath responded, 'Go ahead,' and opened the door. In the kitchen the officers found the rifle that was later introduced in evidence at the petitioner's trial after a motion to suppress had been denied."

391 U.S. at 546, 88 S.Ct. at 1790, 20 L.Ed.2d at 801.

The Court held that the prosecutor's burden of proving that the consent to search was in fact freely and voluntarily given cannot be discharged by showing no more than acquiescence to a claim of lawful authority. But the record here discloses that Hoover was a well trained lawyer with wide experience in the practice of criminal law who invited the officers to search his home. I simply cannot equate the circumstances in the two cases.

However I do agree with the conclusions reached by the dissent in Part II regarding the lack of confrontation. Particularly in view of the Supreme Court's recent decision in Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (June 26, 1972) it is clear that Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) was not intended to represent a radical departure from the Court's traditional analysis of confrontation. Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Bruton v. United States, 391

U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

In the first instance the record here discloses no showing of "the predicate of unavailability", *Mancusi,* 408 U.S. at 212, 92 S.Ct. at 2313, 33 L.Ed.2d at 301, with regard to Sellars. The majority's contention that Sellars may be presumed unavailable because of the possible invocation of his 5th Amendment rights leaves the prosecution in the same position as in Douglas v. Alabama, *supra,* in which the court reversed a conviction where the prosecution read into the record an alleged confession of the defendant's supposed accomplice, Loyd, who refused to testify on self-incrimination grounds. The confrontation problem arose precisely because Loyd could not be cross-examined as to his prior statement. California v. Green, 399 U.S. at 163, 90 S.Ct. at 1937, 26 L.Ed.2d at 499–500.

If the recitation of Sellars' confession amounted to nothing more than a mere violation of the hearsay rule then I would not view the confession as a denial of confrontation. Dutton v. Evans, *supra.* But the confession, even if wholly voluntary, did not afford the jury a satisfactory basis for evaluating the truth of the statement. The confession was neither given nor acknowledged under oath; Sellars was never at any time subjected to cross examination as to the truth or accuracy of the confession, or whether he had in fact made such a statement; and the jury was never given the opportunity to observe Sellars or form any judgment as to his credibility.

Moreover this confession did not contain the indicia of reliability which the Court found in Dutton v. Evans, *supra.* Unlike *Dutton* this case does involve evidence which is "crucial" or "devastating." 400 U.S. at 87, 91 S.Ct. at 219, 27 L.Ed.2d at 226. Unlike *Dutton* this case does involve the use of a confession made in the coercive atmosphere of official interrogation. 400 U.S. at 87, 91 S.Ct. at 219, 27 L.Ed.2d at 226. Unlike *Dutton* this confession does contain express and extensive assertions about past facts. 400 U.S. at 88, 91 S.Ct. at 219, 27 L.Ed.2d at 227. Unlike *Dutton* the confession here was not given in circumstances which would give reason to suppose that Sellars would truthfully represent Hoover's involvement in the crime. 400 U.S. at 89, 91 S.Ct. at 219, 27 L.Ed.2d at 227. Unlike *Dutton* Sellars' confession was not spontaneous. 400 U.S. at 89, 91 S.Ct. at 220, 27 L.Ed.2d at 227.

This case is fully distinguishable from the other Supreme Court decisions in which no violation of confrontation has been found. In California v. Green, *supra,* confrontation was provided at the time of trial in the cross examination of the declarant about his unsworn statement. In Mancusi v. Stubbs, *supra,* confrontation was provided by the opportunity for cross examination at the first trial. Here Hoover was *never at any time* given the opportunity to confront Sellars with his unsworn confession to the police. Instead the jury was invited to believe in the truth of the confession of the unseen and unsworn Sellars as it came from the far more credible mouth of Officer Stone. Without regard to the hearsay rule, this lack of confrontation denied Hoover a fair trial.

Finally, with respect to the claim of "harmless error" I join in Part III of Judge Rives' dissent to the extent that he indicates that the introduction of Sellars' confession was not "harmless error." I feel the court should heed the admonition of Justice Frankfurter in Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946):

"From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered

by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

326 U.S. at 615, 66 S.Ct. at 406, 90 L.Ed. at 356.